ILLINOIS CENTRAL RAILROAD COMPANY, GULF AND SHIP ISLAND RAILROAD COMPANY, SOUTHERN RAILROAD COMPANY *v.* THE INTERSTATE COMMERCE COMMISSION.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

No. 588.   Argued April 22, 23, 1907.—Decided May 27, 1907.

The findings of the Interstate Commerce Commission are made by the law *prima facie* true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience.

The reasonableness of a rate is a question of fact, and while the conclusions of the commission are subject to review if that body excludes facts and circumstances that ought to have been considered they will not after having been affirmed by the Circuit Court and Circuit Court of Appeals, be reversed because the commission did not adopt the presumptions of mixed law and fact put forward by appellants as elements for determining the reasonableness of a rate.

A presumption is the expression of a process of reasoning and of inferring one fact from another, and most if not all the rules of indirect evidence may be expressed as such, but the fact on which the inference is based must first be established before the law can draw its inference.

Where the inquiry before the Interstate Commerce Commission is essentially one of fact, the existence of competition cannot in this court be made an inference of law dominating against the actual findings of the commission and their affirmance by the Circuit Court.

In determining the reasonableness of a railroad rate, expenditures for additions to construction and equipment to handle the traffic should be distributed over the period of the duration of those additions and not charged entirely against the revenue of the year in which they are made. *Union Pacific Railway Co.* v. *United States*, 99 U. S. 402, distinguished.

THIS case involves the validity of an order of the Interstate Commerce Commission requiring the appellants "to cease and desist on or before the first day of April, 1905, from further maintaining or enforcing the unlawful advance of two cents per hundred pounds, or the said unlawful rates resulting therefrom, for the transportation of lumber from shipping points

on defendants' respective lines in the State of Louisiana east of the Mississippi River and in the States of Mississippi and Alabama to Cincinnati, Louisville, Evansville, Cairo, and other points on the Ohio River commonly called and known as Ohio River Points."

The order was made in the matter of the complaint filed with the Commission by the Central Yellow Pine Association, an incorporated association composed of persons, firms and corporations engaged in the business of manufacturing yellow pine lumber in the States of Mississippi, Alabama, and that part of Louisiana east of the Mississippi River.

The complaint charged that the appellants were common carriers by rail, engaged in interstate commerce, and as such were engaged in the transportation of yellow pine lumber from the mills and lumber plants of the members of the Yellow Pine Lumber Association to the territory known as the "Central Freight Association Territory," which lies on the north of the Ohio River and on and between the Mississippi River on the west and a line running through Buffalo and Pittsburg on the east, and that the members of the association are dependent upon appellants for the transportation of their lumber to the markets of the country; that the appellants and the railways carrying yellow pine lumber to the same markets from the territory west of the Mississippi River, embracing the States of Texas, Arkansas, and that part of Louisiana west of the river, by agreement or concert of action advanced the rate on yellow pine lumber from the territories both east and west of the Mississippi River on and beyond the Ohio River in Central Freight Association Territory two cents per hundred pounds. The advance was made applicable south of the Ohio River and effective on and from April 15, 1903, except as to the Louisville and Nashville road, as to which it became effective June 22, 1903. And it was alleged that such advance was "unjust, unreasonable, as well as discriminative in violation of the Act to Regulate Commerce." The answer of the railways admitted the advance, but denied that it had the

character and effect charged, but alleged that, on the contrary, it was reasonable and just and not in violation of law. The answers also specifically justified the advance by the conditions of the market and the traffic, including competition, and the costs of operating the roads. Testimony was taken on the issues thus formed.

The Commission sustained the complaint and made the order recited above. 10 I. C. C. R. 505. The railways refused to obey. The Commission then instituted this proceeding in the Circuit Court of the United States for the Eastern District of Louisiana, where further proof was taken and a decree rendered which affirmed the order of the Commission and made it the order of the court. The roads were also enjoined from further disobedience to the order. No opinion was filed. The testimony was voluminous, and the report and findings of the Commission are very long. They are reported in 10 I. C. C. R. 505, *supra*. The conclusions of the Commission are mingled somewhat with legal arguments, but the following may be selected as important and pertinent to the questions which the controversy presents:

The lumber producing districts are divided in territory (1) west of the Mississippi River; (2) territory east of the river; and (3) southeastern territory, composed of the States of Georgia, Florida, and part of Alabama. The lumber producers of each of these districts compete in the sale of their products in "Central Freight Association Territory."

The roads of the appellants are located in and serve the second of these territories.

The advance in rates was made as well in territory west of the Mississippi River, "and was made, in fact, though not expressly, by agreement between the defendants (appellants) and the roads west of the river," after several meetings, at a consultation between the representatives of the roads. The roads east of the river took the initiative.

At Cairo traffic from a large portion of the lumber producing districts meets or converges *en route* to destination. The

rates on other Ohio River crossings are based on Cairo; that is, they bear a fixed relation to the Cairo rate, being advanced or reduced as that rate is advanced or reduced. The through rates to points beyond the Ohio River in Central Freight Association Territory are made up of the full local rates of the roads north of the Ohio as the proportions of those roads. Whatever is left of the through rates are the proportions of the roads south of the Ohio. The rates to interior points north of the Ohio are made on the lowest combination rates to the Ohio plus the rates beyond, and are blanket rates, being the same from all shipping points or points of production to the same destination. The rates to the Ohio are to the north bank and include the bridge tolls.

There are divisions of rates south of the Ohio between what are termed the "originating" roads, on which the lumber is principally manufactured, and the roads intermediate between them and the river.

There had been from time to time changes or fluctuations in the rate. Prior to 1894 the roads west of the Mississippi claimed and were allowed a differential of two cents. This placed at a disadvantage the shippers east of the Mississippi, and a readjustment of rates was made, and on May 1, 1894, the rate to Cairo from east of the Mississippi was reduced to thirteen cents per hundred pounds, the rate in force from west of the Mississippi. This rate remained until September 9, 1899, about five years, when it was advanced to fourteen cents, and so remained until April 15, 1903, nearly four years, when the advance of two cents complained of was made.

The railroads west of the Mississippi make a certain allowance to the mills which have "logging roads," that is, roads by which logs are hauled from the timber to the mills. This is called "tap line allowance or division." It ranges one to two cents per one hundred pounds, up to as high as six cents, and varies, to some extent, according to the destination of the traffic. The mills east of the river have logging roads also, but appellants make no allowance to them. The only exception

is the Mobile and Ohio road, which grants allowances to about four mills on its line. The New Orleans and Northeastern road put in a tap line allowance of two cents, but other roads east of the river objected, and it was withdrawn. There does not appear to be any reason for such allowance west of the Mississippi which does not apply east of that river, and it amounts to a rebate or reduction from the regularly published rate, and gives an advantage to the mills west of the Mississippi over those east, although the published rates from both are the same.

The lumber business had grown from its inception and was largely and possibly more prosperous than it had been before, but the proof does not show that for two or three years preceding the advance the prices of mill products had materially increased or that the profits realized were unusual or excessively large.

As to the operating expense of the roads the Commission said:

"The proof shows increase in wages and in prices of material and equipment, but not in a marked degree for the two years, 1901 and 1902, immediately preceding the advance rate. These increases have doubtless added materially to the operating expenses, but the total annual increases in those expenses are, of course, due only in part to the advances in wages and prices of supplies and equipment. They are attributable in a great measure to the constant growth or enlargement of the business of the roads. Not only has the lumber business of the roads greatly increased, but their business in general. The greater the volume of business, the greater is the aggregate cost of conducting it, or, in other words, of operating the roads. The total operating expenses of the roads, as reported by them, have also been much enlarged by the inclusion therein of large expenditures for permanent improvements.

\* \* \* \* \* \* \* \*

"While the operating expenses of the defendants have constantly grown, the gross earnings from operation have also

increased from year to year to such an extent as to have resulted in a constant increase in net earnings. This is shown in the tables set forth in our findings of fact (Finding 14)."

Sufficient cause was not shown, either in the alleged profit in the lumber business or in the increased cost of operating the roads, for the advance in the rates on lumber. And answering the contention that the former rate was not adequately remunerative; the Commission expressed the view that "reasonableness in this sense of a rate on a *single article* of traffic is one of almost insuperable difficulty." And further, that the value of the entire property of a road "can shed but little, if any, light upon the question." The rate on one article might reasonably or unreasonably be high and the total of rates be remunerative or otherwise. But, it was concluded, even if that be a mistaken view, it was impossible with any degree of accuracy to determine from the voluminous and conflicting testimony on the subject introduced in behalf of both parties what was the value of the property employed by the roads. The Commission thought that the elements to be considered in determining the reasonableness of an entire system of rates were "widely variant" from those to be considered in determining the reasonableness of a single rate, and expressed the elements upon which the latter depends to be "the value, volume, and other characteristics affecting the transportation of the particular commodity to which it is applied." The Commission referred to its findings of facts as having "many things disclosed by the evidence" which bore directly upon the reasonableness of the particular rate in question, and which aided it in arriving at a correct judgment in respect thereto, saying that:

"In the first place, the present advanced rate is the last (up to date) of a series of advances and was made by joint or concerted action of the carriers. It is claimed by them that in advancing the rate they acted independently, each for itself, but the proof shows conclusively that the advance was the outcome of a concert of action and a previous under-

standing between the companies. Through their authorized official representatives they conferred with each other repeatedly as to the making of an advance; recognized the fact that, because of competition in common markets between the lumber producing districts served by them, the advance should be from all those districts or none, and finally they all promulgated the advance to take effect at exactly the same time and for exactly the same amount. This concurrence of action was not only between the railway companies, parties defendant in this case, and in relation to the rates charged by them, but was participated in by the lumber hauling roads serving the territories west as well as east of the Mississippi River."

The fourteen-cent rate in force at the date of the advance had been maintained nearly four years, and a still lower rate, thirteen cents, had been maintained for the preceding five years and four months. And the testimony of the officers of the roads was that there was a profit in both rates. The answer also admitted profit, but averred that lumber "was not an exceedingly profitable commodity." The Commission said:

"No reason is given or shown why lumber should be singled out as a commodity upc which an 'exceedingly large profit should be earned. A reasonable profit is all the defendants are entitled to, and the testimony is far from convincing us that the profit under the fourteen-cent rate was not reasonable, or would not now be reasonable. As stated in our 'Findings of Facts,' the fourteen-cent rate appears to be reasonably high when compared with the rates on other commodities which are at all analogous to lumber in respect to value, volume and the various conditions affecting the service of transportation. During the period from 1894 to 1899, while the thirteen-cent rate was operative, there were large annual increases in the net earnings of the defendants, and the same was the case from 1899 to 1903, while the fourteen-cent rate was operative (Finding 15). During those periods there was also a large

growth in the tonnage of lumber hauled by the defendants, and, therefore, their increases in net earnings were in part, at least, derived from the lumber traffic under those rates. Dividends have been declared during those periods, and in addition considerable surpluses have been reported (Finding 16) and large sums have been invested in permanent improvements or betterments (Finding 14)."

The seventh and eighth conclusions of the Commission we give entire, as follows;

"The defendants, other than the originating roads, complain of the small amount of revenue or low rate per ton per mile realized by them out of their proportions of the through rates. This is due to the large allowances out of the rates made to the originating roads. (See Findings 3 and 4.) Those allowances commenced under the lower rates in force prior to the advance and raise the presumption that those lower rates, minus the allowances were then considered reasonably remunerative for the remainder of the hauls to the Ohio River crossings. As the two cents advance goes entirely to the roads continuing the transportation on to the Ohio and none of it to the originating roads, the inference is that advance was made solely with a view of increasing the proportions of the former roads. If the allowances to the originating roads are unreasonably large, as they appear to be from a distant standpoint, and result in unreasonably low proportion to the other roads, this cannot be remedied by an advance in the total through rates charged the public. It is the total rate, and not its proportions, which is in issue.

"Although both the net and gross earnings of the defendants have grown from year to year, the percentages of what are reported by the defendants as 'operating expenses' to earnings have also somewhat increased (Table, Finding 14), and this is urged as showing the necessity for an advance in the lumber and some other rates. It is to be noted that these operating expenses embrace large annual expenditures for 'real estate, right of way, tunnels, bridges, and other strictly

permanent improvements, and also for equipment, such as' locomotives and cars.' "

And the Commission said repairs, whether to improvement. or equipment, were properly chargeable to operating expenses, but that expenditures for improvements and equipments should not "be taxed as part of the current or operating expenses of a single year, but should be, so far as practicable, and so far as rates exacted from the public are concerned, 'projected proportionately over the future.' " It was said further, if such expenditures should be deducted from the annual operating expenses it would be found that the percentage of operating expenses to earnings had, in some instances, diminished, and in others increased, to no material extent.

The tenth and eleventh conclusions are as follows:

"10. The general rule is, the greater the tonnage of an article of traffic, the lower is the rate. No rule is more firmly grounded in reason or more universally recognized by carriers. It is because of the greater density of traffic north of the Ohio River in Central Freight Association Territory and in Eastern Territory that rates in general are materially lower in those territories than in Southern Territory. The defendants have made yellow pine lumber an exception to this rule; while the tonnage in general of the defendants and lumber tonnage in particular have grown greatly, the lumber rate has not been lowered but has been materially advanced. Moreover, the testimony is that 'a decrease in the rates on traffic in general has been going on throughout the United States since the improvements in transportation have been put in operation;' here, again, lumber has been taken from under, and deprived of the benefits of, the general rule.

"11. As said in *Marten* v. *L. & N. R. R. Co.*, 9 I. C. C. R. 589, and shown by the proof in this case, 'lumber is an inexpensive freight and only a few other commodities furnish to carriers so large a tonnage.' The lumber business is constant, yielding the carriers revenue all the year; no special equipment is constructed or furnished for its carriage; it is

loaded by the shipper and unloaded by the consignee, and where open cars are furnished, the shipper is required at con-, siderable expense to equip them so as to protect the load and the train; there is small risk incident to its transportation and, in case of accident, the damage is insignificant. For these reasons lumber should be given rates which are relatively low.

"Our conclusion on the whole is that the advance, April 15, 1903, of two cents in the Cairo rate (with a corresponding increase in the rates to the other Ohio River crossings) was not warranted under all the facts in evidence, and that the resultant increased rate is unreasonable and unjust. An order will be issued in accordance with these views."

*Mr. Ed. Baxter* for appellants:

The majority of the Commission erred in holding that the rates from Mississippi territory to the Ohio River are unreasonable. The phrase "just and reasonable in and of themselves" was used by this court in the case of *E. T., V. & G. Ry. Co.* v. *I. C. C.,* 181 U. S. 18, 19. And see *Van Patten* v. *C., M. & St. P. Ry. Co.,* 81 Fed. Rep. 545; *Kinnavey* v. *Terminal Assn.,* 81 Fed. Rep. 802, and *T. & P. Ry.* v. *Mudd,* 202 U. S. 242. The Commission erred in deciding that said so-called advance of two cents per hundred pounds, made effective April 15, 1903, makes the through rates from Mississippi territory to the Ohio River unreasonably high in and of themselves; because there is no question but that said through rates were "adopted, printed and kept posted" by the respective appellants as required by the act to regulate commerce.

Even if the question of the reasonableness in and of itself of a rate on a single article of traffic is one of almost insuperable difficulty, that gives no authority to the Commission to solve it by mere arbitrary action. *C., N. O. & T. P. Ry.,* v. *I. C. C.,* 162 U. S. 197.

The rates from points in Mississippi territory to the Ohio River are reasonably low, because the average rate per ton per mile yielded by said rates is lower than the majority of

other rates per ton per mile on lumber; and also because they are lower than the rates on lumber between many other points for similar distances. Also because the lumber interests in Alabama, Mississippi and Louisiana have prospered under the rate adjustment and the percentage of increase has been greater in the price of lumber than in the rates on lumber.

The increase made was justified by the change in the condition of the lumber market.

It was error of law to hold that the cost of permanent improvements and equipment is improperly charged to operating expenses. *U. P. R. R. Co.* v. *U. S.*, 99 U. S. 420, 421.

In charging the cost of permanent improvements and equipment to operating expenses, appellants adopted the method which this court held to be the most conservative and beneficial to the company and operates as a restraint against injudicious dividends and the accumulation of a heavy indebtedness.

The rate on lumber may be somewhat remunerative and yet be unreasonably low, as said in *Smyth* v. *Ames*, 169 U. S. 542.

As to competing roads, that competition tends to a reduction of rates—sometimes, as the history of the country has shown, below that which affords any remuneration to those who own property.

Therefore this court has never allowed the fact that the longer distance competitive rate pays something more than the cost of movement of the longer distance competitive traffic (and is, therefore, to some extent remunerative) to avail as an argument that the higher rate for the shorter distance traffic is unreasonably high.

Yellow pine lumber manufactured in Mississippi territory may be moved by various competing lines to New York and other North Atlantic cities, or it may be moved by various competing vessels to Europe; or it may be moved, as in this case, by various competing roads to points on and north of the Ohio River; and when moved to points on and north of

the Ohio River it comes into competition with white pine, spruce and hemlock from Canada and the Northern States, with fir from the Pacific coast, and with yellow pine from Georgia territory and Arkansas territory.

It is manifest therefore, that rates on yellow pine from Mississippi territory to points on and north of the Ohio River must be made in strong competition with other carriers and with other woods. In other words, there is competition of product against product, and competition of carrier against carrier.

Neither the Commission nor the court had jurisdiction to determine the reasonableness of the proportions of a through rate and it was error of law for the Commission and the court to assume jurisdiction to determine either that the proportions of the originating roads are unreasonably large, or that the proportions of the intermediate roads are unreasonably low. 11 Ann. Rep. I. C. C. 1897, 27.

It was not until the act was amended June 29, 1906, that the Commission was given the power by § 15 to prescribe "the just and reasonable proportions of such joint rate to be received by each carrier party thereto." 34 U. S. Stat. at Large, 584.

The articles of the Southeastern Freight Association and of the Southeastern Mississippi Valley Association do not violate the anti-trust act, nor do they conflict with *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, and *United States* v. *Joint Traffic Assn.*, 171 U. S. 505.

Associations were not formed for the purpose of "*maintaining*" rates. On the contrary, each member distinctly reserves to itself, at all times, the right to take separate and independent action on each and every subject; and therefore it may change its rates at any time, without being subject to penalty, or even to censure.

*Mr. L. A. Shaver, Mr. T. M. Miller* and *Mr. Marcellus Green*, with whom *Mr. Garner Wynn Green* was on the brief, for appellee:

The materially lower lumber rates in force prior to the

advance in rates having been maintained by the carriers for a long period of time, must be presumed to have been reasonably remunerative and the burden is, therefore, upon the carriers to show sufficient grounds for the advance. Am. & Eng. Enc. of Law, 2d ed., Vol. 17, 133; *Holmes* v. *So. Ry. Co.,* 8 I. C. C. R. 568.

The claim that the advance was justified because the yellow pine lumber business was exceptionally prosperous, is untenable. The test of the reasonableness of a rate is not the amount of profit there is in the business of the shipper, but whether the rate yields a reasonable compensation for the service rendered. *Smythe* v. *Ames,* 169 U. S. 466; *Tift* v. *So. Ry. Co. et al.,* 138 Fed. Rep. 754.

The fact that there had been an increase in the operating expenses of the carriers did not justify the advance because there was also a constant increase not only in their gross but also in their net earnings.

If additional revenue was needed to meet increased operating expenses incurred in the handling and transporting of all traffic, it should have been raised by an advance in rates on traffic in general and the imposition of the burden on a comparatively few articles like lumber, was a discrimination against those articles in favor of traffic in general.

If, in such case, it is proper to select a few articles, the selection should be made with due regard to the character of the articles selected and the interests of the public. Lumber being an article of general use or necessity should not have been selected.

Where otherwise competing carriers by a previous understanding or agreement make an advance in rates, the advance so made cannot be held to be the product of unrestrained competition. Competition never advances rates. The natural, direct and immediate effect of competition is to lower rates. *United States* v. *Joint Traffic Association,* 171 U. S. 577.

Where the Commission has duly investigated the facts and the court below has sustained the finding of the Commission

on such investigation, this court will decline to undertake an original investigation of the facts on its own account: and will not set aside the findings of the Commission except in a clear case of error. *C., N. O. & T. P. Ry. Co.* v. *I. C. C.*, 162 U. S. 194; *L. & N. R. R. Co.* v. *Behlmer*, 175 U. S. 675; *E. T., Va. & Ga. Ry. Co.* v. *I. C. C.*, 181 U. S. 27.

Mr. Justice McKenna delivered the opinion of the court.

Counsel for appellants in his oral argument made the declaration that it would not be necessary for this court to open the pages of testimony contained in the record, and says in his supplemental brief:

"I do not insist that this court shall read the voluminous testimony contained in these records, but I do most respectfully ask it to lay down the rules or principles of transportation law which are fairly involved in the just determination of these cases, and to remand them to the Commission to be re-examined upon the testimony in conformity with the principles of transportation law to be announced by this court."

To what, then, shall we resort? How shall we determine what "principles of transportation law" were involved? How determine whether they were recognized and applied, or denied and rejected by the Commission, and, necessarily, by the Circuit Court? An examination of the testimony by concession of counsel is out of the question. And the findings of the Commission are made by law *prima facie* true. This court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience. *Louisville & Nashville Railroad Co.* v. *Behlmer*, 175 U. S. 648; *East Tenn. &c. Railroad Co.* v. *Interstate Commerce Commission*, 181 U. S. 1, 27. And in any special case of conflicting evidence a probative force must be attributed to the findings of the Commission, which, in addition to "knowledge of conditions, of environment and of transportation relations," has had the witnesses before it and has been able to judge of them and

their manner of testifying. In the case at bar these considerations are reinforced by a concurrent judgment of the Circuit Court.

The question is one of the reasonableness of a rate, and such a question was said to be one of fact in *Texas & Pacific Ry.* v. *Interstate Commerce Commission,* 162 U. S. 197; *C. N. O. & T. P. Ry.* v. *Interstate Commerce Commission,* 162 U. S. 184. In these cases, however, it was declared that the conclusions of the Commission are subject to review if it excluded "facts and circumstances that ought to have been considered." Upon this declaration appellants rely, and justify their invocation that this court express and enforce the principles of transportation which, they contend, the Commission disregarded; and appellants venture the observation that unless this be done "there will be no settled principles of law for the guidance of either the Commission or of the courts," and that "the interstate railroad companies will be the only persons in this country who will not be able to obtain the opinion of the courts upon questions of law which vitally affect their interest." We think the apprehension is groundless and is demonstrated to be groundless by the cases cited. In all of them legal propositions were reviewed as elements in the inquiry of the reasonableness of a rate. Those cases, however, are in marked contrast to the pending case. It will be observed that in them the instances were very simple. There was a salient circumstance in each of them about which there was no uncertainty. In other words, it was unconfused by dispute and was not put to question by a conflict of testimony. A definite legal proposition unmixed with fact was presented and the only act of judgment exercised by the Commission was to reject it.

In *Cincinnati, New Orleans & Texas Pacific Railway* v. *Interstate Commerce Commission,* passing on the effect of a shipment on a through bill of lading to give jurisdiction to the Commission (in which the Commission was sustained), the questions presented were the power in the Commission

to fix a maximum rate, and whether competitive conditions could be considered by a railroad in fixing a greater charge for a shorter than a longer distance on its own line. It was decided that the power to pass on the reasonableness of an existing rate did not imply the power to prescribe a rate. On the conditions affecting competition, it was not found necessary to pass, but the following passage is worth the quoting as bearing on the contention of appellants:

"It has been forcibly argued that, in the present case, the Commission did not give due weight to the facts that tended to show that the circumstances and conditions were so dissimilar as to justify the rates charged. But the question was one of fact, peculiarly within the province of the Commission, whose conclusions have been accepted and approved by the Circuit Court of Appeals, and we find nothing in the record to make it our duty to draw a different conclusion."

In *Texas & Pacific Railway* v. *Interstate Commerce Commission* ocean competition as constituting a dissimilar condition and as justifying a difference in rates between import and domestic traffic was the circumstance considered. The Interstate Commerce Commission had ruled against such competition as a factor and condemned rates made in view of it to be undue and unjust. The court observed:

"But we understand the view of the Commission to have been that it was not competent for the Commission to consider such facts—that it was shut up by the terms of the act of Congress, to consider only such 'circumstances and conditions' as pertained to the articles of traffic after they had reached and been delivered at a port of the United States or Canada."

And further:

"We have, therefore, to deal only with a question of law, and that is, what is the true construction, in respect to the matters involved in the present controversy, of the act to regulate commerce? If the construction put upon the act by the Commission was right, then the order was lawful; otherwise it was not."

The ruling of the Commission was reversed.

In *Interstate Commerce Commission* v. *Alabama Midland Railway*, 168 U. S. 144, there was passed upon a decision of the Commission that the competition of river lines of transportation was not a factor to be considered when determining whether property transported over the same line is carried under "substantially similar circumstances and conditions," as that phrase is found in the fourth section of the Interstate Commerce Act. The decision was declared to be an erroneous construction of the act.

In *Louisville & Nashville Railroad Co.* v. *Behlmer* (passing by subordinate questions) the dominant element was the construction of the fourth section of the Interstate Commerce Act. The Commission and the Circuit Court of Appeals, it was said, "mistakenly considered as a matter of law that competition, however material, arising from carriers who were subject to the act to regulate commerce could not be taken into consideration; likewise that competition, however substantial, not originating at the initial point of the traffic, was equally as a matter of law excluded from view."

In all these cases, therefore, there was a single, distinct and dominant proposition of law which the Commission had rejected, and the exact influence of which, in its decisions, could be estimated. Indeed, they were mere constructions of the statute, the delegation of the Commission's duties and power. Let us now see what the propositions are which appellants propose for our adoption. They are presented as presumptions of law, which dispense with evidence until rebutted or countervail evidence by their probative force. (1) That the rate published by a carrier is reasonably low. (2) A rate upon a commodity, made by the competition of carriers, is reasonably low, and the burden is on him who assails it. (3) A rate upon a commodity as low, or lower, than the majority of rates charged by other carriers for the transportation of the same grade of commodities for similar distances in the same or other territory, is reasonably low, and the burden is upon him who

insists that it is unreasonably high. (4) A rate charged by a carrier which has the "strongest possible motive" to develop and increase a traffic in a particular commodity, and has maintained such rate for a "long series of years," so as to have induced a large and continuous increase of business in that commodity and of the capital invested, is reasonably low. (5) Rates being so adjusted upon a commodity, so as to enable it to move with profit to the shipper, whatever the conditions of the market, reducing the rates as the market declines, only increasing them as the market improves, a particular increase is reasonable, if it be shown that the percentage of increase has been greater in the price of the commodity than in the rates on it. (6) Rates reduced to meet a market depression and kept in effect during the depression, and increased when the depression ceases which does not cause the increased rates to exceed the rates that were maintained by the carrier, prior to the depression, are reasonable. (7), (8) Increase in rates upon all commodities impartially to meet largely increased expenditures on account of an abnormal increase in the volume of traffic is reasonable, "provided the gross earnings of the carrier yield less than the normal proportion of net earnings." Or provided the percentage of increase has been greater in the operating expenses of the carrier than in the rates upon the commodity. (9), (10) Upon the supposition that certain improvements have been made necessary by "an abnormal increase of traffic," they should be taken into account in determining the reasonableness of an increase of rates upon a commodity, whether as a matter of bookkeeping the expenditures should be charged to capital account or to the operating expenses; and without regard to the fact whether such expenditures have been paid out of the carrier's earnings or have been provided for by the issuance of bonds. (11) A rate on a commodity is profitable if it exceeds the cost of its movement; and, yet, the rate may be unreasonably low, if it does not contribute its fair share to operating expenses, taxes and fixed charges.

If these propositions should be granted as axioms of transportation there is the difficulty, as we have already pointed out, of determining to what extent—that is, whether to prejudicial extent, if at all—they were disregarded by the Commission and by the Circuit Court. The Circuit Court affirmed the order of the Commission, and it is an instant assumption that the court considered all the elements in the testimony and inferences from it. And the propositions of appellant are inferences of mixed law and fact, hence disputable—may be overcome or counterpoised, and, therefore, the court in reaching its ultimate judgment may have given them all the weight to which they were entitled.

It is almost impossible to discuss the contentions of appellants without bringing forward the elemental. A presumption is the expression of a process of reasoning, and most, if not all, the rules of indirect evidence may be expressed as such. We cannot go far in the investigation of any controversy without finding ourselves compelled to infer one fact from another, but we would not therefore be justified in declaring such inferences legal axioms. It is to this that appellants invite us and seek to erect disputable inferences from conduct that may have many explanations into intendments of law.

In this connection *Texas Pacific Railway* v. *Interstate Commerce Commission, supra,* is an instructive case. In that case, we have seen, it was decided that whether the rate was reasonable or unreasonable, was a question, whatever its theoretical nature, for the tribunal that decides upon matters of fact. Among other cases cited to sustain that position was *Denaby Main Colliery Company* v. *Manchester &c. Railway Company,* 3 Railway and Canal Traffic Cases, 426. In that case it was declared that reasonableness of a rate was a question of fact and not reviewable by an appellate court, unless circumstances which ought to have been considered were not considered, and that a decision must be arrived at fairly looking at all the circumstances that are proper to be looked at. The appellant in the case contended against the consideration by the rail-

way commissioners of competition between two places, and
the Court of Appeals, replying, said:

"If the appellants can make out that, in point of law, that
is a consideration which cannot be permitted to have any
influence at all, that those circumstances must be rigidly ex-
cluded from consideration, and that they are not circumstances
legitimately to be considered, no doubt they establish that
the court below has erred in point of law. But it is necessary
for them to go as far as that in order to make any way with
this appeal, because once admit that to any extent, for any
purpose, the question of competition can be allowed to enter
in, whether the court has given too much weight to it or too
little, becomes a question of fact and not of law. The point
is undoubtedly a very important one."

And it may be well to say here as a suggestive principle
throughout that, it was pointed out, such conclusions of fact
were "to be arrived at, looking at the matter broadly and
applying common sense to the facts that are proved." The
remarks of Willes, J., in *Phipps* v. *London & North-Western
Railway*, 2 Q. B. D. 1892, pp. 229, 236, when the case was be-
fore the Railway Commissioners, were in effect approved. This
court also quoted them. Willes, J., said, speaking of the
questions of undue or unreasonable preference or advantage
to or in favor of any particular person under section 2 of the
Railway and Canal Traffic Acts, that they were eminently
practical, "and if this court once attempts the hopeless task
of dealing with questions of this kind with any approach to
mathematical accuracy, and tries to introduce a precision
which is unattainable in commercial and practical matters,
it would do infinite mischief and no good."

It is conceded, as we have said, that the presumptions
contended for by appellants are mixed of law and fact, except,
may be, those which we shall presently consider. If either
element is dominant in such presumptions, it must be that
of fact. In other words, the fact must be ascertained before
the law draws its inference. This is especially pertinent to

the propositions urged by appellants. Let us illustrate. Take, for example, the second proposition that "a rate upon a commodity *made by competition* of carriers is reasonably low, and the burden is on him who assails it." But suppose competition is not established or is disproved, what becomes of the inference and the onus of proof dependent upon it? The question marks the condition that appellants encounter in the findings of the Commission. The findings of the Commission in effect negative the facts upon which the propositions depend. In still greater degree there is illustration in the first proposition. That proposition is an inference from an inference, as we shall presently point out. The reasonableness of the rate is inferred from competition, and competition is inferred from the publication of the rate.

This comment, it may be said, is not applicable to the ninth and tenth propositions of appellants, as they present propositions of law which were not only disregarded by the Commission, but the antithesis of them was asserted in the eighth finding. This contention must be specifically considered. The Commission finds that the net and gross earnings of the appellant have grown from year to year, and also that what they have reported as operating expenses have also grown. But in these operating expenses there were included "expenditures for real estate, right of way, tunnels, bridges, and other strictly permanent improvements, and also for equipment, such as locomotives and cars." The Commission expressed the opinion that such expenditures should not be charged to a single year, but "should be, so far as practicable and so far as rates exacted from the public are concerned, 'projected proportionately over the future.'" And it was said: "If these large amounts are deducted from the annual operating expenses reported by the defendants (appellants), it will be found that the percentage of operating expenses to earnings has in some extent diminished and in others increased to no material extent." The exact effect of the difference of view between appellants and the Commission as to operating expenses there is no test,

but it cannot be said, even if the Commission was wrong as
to such expenses, that error in its ultimate conclusion is
demonstrated or that the correctness of the conclusion is made
so doubtful as to justify a reversal. The findings show that
the old rates were profitable and that dividends were declared
even when permanent improvements and equipment were
charged to operating expenses. But may they be so charged?
Appellants contend that the answer should be so obviously
in the affirmative that it should be made an axiom in trans-
portation. On principle it would seem as if the answer should
be otherwise. It would seem as if expenditures for additions
to construction and equipment; as expenditures for original
construction and equipment, should be reimbursed by all of
the traffic they accommodate during the period of their du-
ration, and that improvements that will last many years
should not be charged wholly against the revenue of a single
year. But it is insisted that *Union Pacific Railway Co.* v.
*United States*, 99 U. S. 402, establishes the contrary. That
case was not concerned with rates of transportation or the
rule which should determine them against shippers. It was
concerned with the construction of the words "net earnings"
in an act of Congress, five per cent of which earnings were
provided to be applied annually to a loan by the Government
to the railroad. Considering the provision of the act and
its purpose, it was concluded "that the true interest of the
Government" was "the same as that of stockholders, and
would be subserved by encouraging a liberal application of
the earnings to the improvement of the works." "It is better,"
it was said, "for the ultimate security of the Government
in reference to the payment of its loan, as well as for the service
which it may require in the transportation of its property
and mails, that a hundred dollars should be spent in improving
the works, than that it should receive five dollars towards
the payment of its subsidy. If the five per cent of net earnings,
demandable from the company, amounted to a new indebted-
ness, not due before, like a rent accruing upon a lease, a more

rigid rule might be insisted on. But it is not so; the amount of the indebtedness is fixed and unchangeable. The amount of the five per cent and its receipt at one time or another is simply a question of earlier or later payment of a debt already fixed in amount. If the employment of any earnings of the road in making improvements lessens the amount of net earnings, the Government loses nothing thereby. The only result is, that a less amount is presently paid on its debt, while the general security for the whole debt is largely increased." The interest of the Government in the improvement of the road was even greater than that of a stockholder. This was manifest from its munificent gift of lands, in addition to its generous loan of credit. As benefactor of the road and as creditor of it, as a Government concerned with the development of the country, as a money lender concerned with the extent of security, "the true interest" of the United States might be that revenue should be applied to improvements. Payment of the debt was only postponed, not denied, and this and the other considerations, might well determine the construction of words in the statute which were capable of different meanings. But such is not the relation or concern of a shipper of lumber. His right is immediate. He may demand a service. He must pay a toll, but a toll measured by the reasonable value of the service. The elements of that value may be many and complex, not always determinable, as we have seen, with mathematical accuracy, but, we think, it is clear, that instrumentalities which are to be used for years should not be paid for by the revenues of a day or year; and this is the principle of returns upon capital which exists in durable shape.

The first proposition submitted by appellants may also be said to be so far absolute and independent of evidence as to be considered as a presumption of law simply. This is contended on the authority of *Van Paten* v. *Chicago, Milwaukee & St. Paul Railway Co.,* 81 Fed. Rep. 545. It is difficult to analyze the case briefly. It was an action of damages against the railroad for charging unjust and unreasonable rates under

the assumption that sections 8 and 9 of the Interstate Commerce Act gave such an action, though the railroad had charged according to the schedule of rates filed with the Interstate Commerce Commission. The answer of the railroad set up the schedule and that rates had been charged shippers in accordance with it. The court overruled a demurrer to the answer and adjudged the defense good. The court discussed the question in an elaborate opinion, and, led by the difficulties of applying all of the provisions of the act, which were enacted, the court observed, to correct "the mode in which carriers imposed their charges," sought in the act itself a standard of reasonableness.

The court, in its opinion, referred to the evils which had existed—rebates from published schedules, preferences and discriminations against shippers—and the purpose and hope of the act to correct them through the requirement of an imperative statutory standard, and by that, and other requirements, to establish free competition between railroads and, as a result of competition, reasonable rates. But it was not said or intended to be said that competition followed as a presumption of law in any given case. The court did not intend to assert a rule deduced from the conduct of railroads—conduct so far constant that the law would base a presumption upon it and forever fix it as one of its intendments. Indeed the court meant to do no more than to deny a right of action for unreasonableness in the rates as filed. And this court, in *Texas & Pacific Railway Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, has decided that the redress of a shipper for such unreasonableness must be through the Interstate Commerce Commission. It is certain that a presumption that was sufficient to defeat an action in the Circuit Court could not be urged to defeat an inquiry by the Commission. Of course, if a complaint should be filed before the Commission and no proof adduced to support it, we cannot doubt but that the complaint would be dismissed; but this because of the principle that the party who asserts the affirmative in any controversy ought

to prove the assertion, and that he who denies may rest on his denial until, at least, the probable truth of the matter asserted has been established. "The reason is obvious: to all propositions, which are neither the subject of intuitive or sensitive knowledge, nor probabilized by experience, the mind suspends its assent until proof of them is adduced." Best on Presumptions, sec. 32.

There are other contentions of appellants which we think are untenable. One only needs comment. It is said that it was error to hold the advance unreasonable and unjust because the charges made on lumber to Cairo and other points on the Ohio River "are mere divisions of through rates, the justness of which neither the Interstate Commerce Commission nor the Circuit Court has any jurisdiction to determine." Indeed, it is said, to do so is an exercise of a legislative function. We think the contention is in effect answered by *Cincinnati, New Orleans & Texas Pacific Railway* v. *Interstate Commerce Commission*, 162 U. S. 184. If the contention is intended to be as extensive as its words seemingly make it, it would withdraw from the supervision of the Interstate Commerce Commission and from the courts every shipment over two or more railroads. There necessarily must be some apportionment of the rates between such roads, and whether the advance should be made in the rates over one road or the other, or in the rates over all, can make no difference. In other words, it is competent for the Commission or the courts to consider the through rate, however composed. It must not be overlooked that the Commission and the Circuit Court found that the advance in the case at bar was made by agreement between the roads, and was not the individual action of each, induced by competition. It is true the contrary fact is asserted. It is asserted, that such action was the result of competition, and, that the "legal value" to which competition was entitled was not given it. The argument to support the contention has not convinced us. The inquiry was essentially one of fact, and the attempt to make competition an inference of law and dominating against the

findings of the Commission and their affirmance by the Circuit Court we have already rejected.

But little more discussion is necessary. The concession of counsel with which we have commenced this opinion is a frank recognition of the effect which this court has given to the decisions of the Interstate Commerce Commission on questions of fact. And we have said very recently: "The statute gives *prima facie* effect to the findings of the Commission, and when those findings are concurred in by the Circuit Court, we think they should not be interfered with, unless the record establishes that clear and unmistakable error has been committed." *Cincinnati, Hamilton & Dayton R. R.* v. *Interstate Commerce Commission, ante,* page 142.

It is true, appellants assert, that clear and unmistakable error has been committed, but upon ground untenable as we have seen. And the present case above all others calls for the application of the rule. The question submitted to the Commission, as we have said, with tiresome repetition perhaps, was one which turned on matters of fact. In that question, of course, there were elements of law, but we cannot see that any one of these or any circumstances probative of the conclusion was overlooked or disregarded. The testimony was voluminous. It is not denied that it was conflicting and, by concession of counsel, it included a large amount of testimony taken on behalf of appellants in support of the propositions contended for by them. Whether the Commission gave too much weight to some parts of it and too little weight to other parts of it is a question of fact and not of law. It seems from the findings, report and conclusions of the Commission that it considered every circumstance pertinent to the problem before it.

Further testimony was taken by the Circuit Court and its judgment confirmed that of the Commission and approved its order.

*Decree affirmed.*

MR. JUSTICE MOODY took no part in the decision of this case.
MR. JUSTICE BREWER dissents.