**JONES MOTOR CO., Inc.**

v.

**The UNITED STATES of America**

and

**The Interstate Commerce Commission.**

**Civ. A. No. 32629.**

United States District Court
E. D. Pennsylvania.

June 4, 1963.

---

**134**

Ganey, Circuit Judge, dissented.

Roland Rice, Rice, Carpenter & Carraway, Washington, D. C., William J. Wilcox, Allentown, Pa., Christian V. Graf, Harrisburg, Pa., for plaintiff.

Drew J. T. O'Keefe, U. S. Atty., by Graeme Murdoch, Asst. U. S. Atty., for United States.

Robert W. Ginnane, General Counsel, by H. Neil Garson, Associate General Counsel, for Interstate Commerce Commission.

Robert H. Young, Morgan, Lewis & Bockius, Philadelphia, Pa., for intervening defendants Highway Express Lines, Inc., and Modern Transfer Co., Inc.

William A. Goichman, Philadelphia, Pa., for intervening defendant Pennsylvania Public Utility Commission.

Before GANEY, Circuit Judge, and WOOD and JOSEPH S. LORD, III, District Judges.

WOOD, District Judge.

Plaintiff, an interstate motor carrier certificated by the Interstate Commerce Commission, but without a certificate granted by the Pennsylvania Public Utility Commission, covering the specific operation in question, commingled 22 Pennsylvania shipments with 108 other shipments, admittedly interstate in character, and transported these 130 shipments over routes through the State of New Jersey.

On May 1, 2 and 24, and June 28, 1957, these 22 shipments, destined for points in Pennsylvania, were moved from Philadelphia, over U. S. Highway 1 to Trenton, thence over New Jersey Highway 69 to Clinton, thence over U. S. Highway 22 to Allentown, and return movements were over the same routes. The plaintiff operated between Philadelphia and the Allentown, Pennsylvania area over the described routes by tacking its two interstate authorities.[1]

The basic facts presented to the Hearing Examiner were either the subject

---

1. Jones' Certificates are as follows:
    "(a) *Between* Philadelphia, Pa., and New York, N. Y. over U. S. Highway 1, serving all intermediate points, including Trenton, N. J., and off-route points, including 35 miles of Princeton, N. J., and
    "(b) *between* Elizabeth, N. J., and Allentown, Pa., via U. S. Highway 22 and

of a stipulation or were not disputed. Plaintiff is primarily an interstate carrier but also operates its lines between other Pennsylvania points with permits issued by the Pennsylvania Public Utility Commission.

During the period previously referred to, Jones Motor Co., Inc., hereinafter referred to as "Jones," conducted daily operations between Allentown and Philadelphia over the specified route via Clinton, New Jersey. The shipments involved moved over these routes at night and there were no pickups, changing of freight from one vehicle to another, or any business or terminal stops in New Jersey. This was a terminal to terminal operation by Jones with distribution or pickups by Jones via peddle runs to and from intermediate points and points in the area served by it, or Jones connected with an interline carrier where points beyond were involved. Jones also transported over the same route other movements of the same consignors and consignees as are involved in the shipments covered by this action.

The night operation is the only scheduled run between Allentown and Philadelphia, but operations were also conducted during this period, wholly or partially over this route, but not on a scheduled basis, during daytime—pickups and deliveries being made directly by Jones from and to points in New Jersey. The involved routes used by Jones and rates pertaining to all the shipments involved in this action were published in appropriate tariffs filed with the Commission. No effort was made by Jones at any time to conceal its manner of operation over the involved route. Jones' solicitors are stationed at Allentown and Philadelphia and at the time covered by this action traffic was solicited for freight forwarders, steamship companies, export, for traffic having both origins and destinations in Pennsylvania, and for interline carriers with which it had published through routes and rates.

Jones was denied authority by the Pennsylvania Public Utility Commission (P.U.C.) to operate between the Philadelphia and Allentown areas over routes wholly in Pennsylvania on July 21, 1955. On or about August 5, 1957, the P.U.C. initiated a Complaint against Jones. The P.U.C. heard its own Complaint and sustained it by its own decision and issued a Cease and Desist Order against Jones Motor Co., Inc. (Docket C–16813). Jones then appealed through the Pennsylvania Appellate Courts [2] without success.

Following this series of events, Jones petitioned the United States Supreme Court for a Writ of Certiorari, which Court granted the Petition and reversed the judgment of the Superior Court of Pennsylvania in Jones Motor Co., Inc. v. Pennsylvania Public Utility Commission, 361 U.S. 11, 80 S.Ct. 60, 4 L.Ed.2d 50 (1959), a *per curiam* opinion which cited Service Storage & Transfer Co. v. Virginia, 359 U.S. 171, 79 S.Ct. 714, 3 L.Ed.2d 717 (1959). The United States Supreme Court denied the P.U.C.'s Petition for Reconsideration and Clarification, wherein it prayed the Court "to file a clarifying opinion or memorandum order expressly stating that the judgment of the Court below was reversed on jurisdictional grounds without regard to the merits of the controversy in the instant cause." 361 U.S. 904, 80 S.Ct. 204, 4 L.Ed.2d 160 (1959).

Thereafter, the P.U.C. filed a Complaint with the Interstate Commerce Commission docketed by the Commission at M.C.–C–2732, naming Jones as defendant. This Complaint averred that the operations by Jones in transporting property between certain Pennsylvania points over routes lying partly in New Jersey were beyond the scope of its cer-

---

New Jersey Highway 28, serving all intermediate points, including Clinton, N. J., on U. S. Highway 22, and serving off-route points in Pennsylvania within 25 miles of Allentown, Pa."

2. Jones Motor Co., Inc. v. Pennsylvania Public Utility Commission, 188 Pa.Super. 449, 149 A.2d 491 (1959); Allocatur refused by the Pennsylvania Supreme Court, 123A, Misc.Docket.

tificated authority and requested the issuance of a Cease and Desist Order.

Jones filed a Motion to Dismiss the Complaint at MC–C–2732 with the Interstate Commerce Commission (I.C.C.) predicating that Motion upon the doctrine of *res adjudicata* and on the merits. The Motion was denied by the I.C.C. A hearing was held before the Examiner in Philadelphia on February 8, 1961 and Jones renewed its Motion to Dismiss. On September 28, 1961, the Examiner filed his "Corrected Report and Recommended Order," finding that Jones was performing authorized transportation between points in Pennsylvania through points in New Jersey, recommending the dismissal of the Complaint against Jones at MC–C–2732 on the merits, but denying the Motion to Dismiss which was presented formally at the outset of the hearing.

As previously stated, none of the basic facts are in dispute, and they were admitted by Jones in stipulations of fact.

Stated *seriatim* the Examiner concluded that:

1. The longer circuitous routes utilized by Jones in and of themselves were not proof of bad faith or subterfuge,[3] and

2. There existed "logical," "practical" and "feasible" reasons " *  * from the standpoint *of operating efficiency and economy,* for a carrier to include in the same vehicle with 108 shipments, which are admittedly in interstate commerce and moving over routes specified in its interstate certificates, 22 other shipments, over a period of four specified days, which, if defendant (Jones) had held the appropriate authority, might technically have been moved by themselves over a shorter route.

" *  *  * It would not have been likely for defendant (Jones) to move an average of 5 shipments per day on four different days over this route, by themselves, while moving other shipments the same days in the same area in other vehicles via different routes it had to use for these other shipments, *  *  * " and

3. The tacking by Jones of its two interstate authorities [4] was proper as no restrictions against operations between Allentown and Philadelphia were imposed when the certificate of public convenience and necessity giving rise to such authority was granted, and

4. Jones' operations between two points in Pennsylvania, via New Jersey, are physically in interstate commerce, and fall within the purview of the operating authorities contained in Jones' certificates which specifically described the operations authorized therein as transportation in interstate commerce, and

5. No showing had been made that the operations of Jones under its Certificates were not bona fide.

Following this decision the P.U.C. and the Intervenors filed exceptions and supplemental exceptions. Jones replied to all of these exceptions on December 8, 1961. On June 5, 1962, the I.C.C.,

---

3. It was stipulated between counsel that the routes traversed by Jones between Philadelphia and Allentown, terminal to terminal, covered a distance of 96.2 miles and the driving time is three hours. Between the same points over U. S. Highway 309, lying wholly within Pennsylvania, the distance would be 55 miles and the driving time two hours, five minutes.

Over the Pennsylvania Turnpike between the same points, wholly within Pennsylvania, the distance would be 74.9 miles and the driving time is one hour, fifty minutes.

4. See note 1, supra, for a description of Jones' I.C.C. authorities. The following points are pertinent in this matter: Clinton, N. J. is within 35 miles of Princeton, N. J. and the Pennsylvania points of Easton and Bethlehem were served as *intermediate* points on U. S. Highway 22. Catasauqua, Pa. and Emmaus, Pa., other points mentioned in the Complaint, are within 25 miles of Allentown; Chester, Pa. is within the Philadelphia commercial zone, and Hatboro, Pa. was served via an unnumbered highway between Hatboro and Philadelphia.

through Division 1, issued its "Report of the Commission," (see 89 M.C.C. 605), reversing the Examiner, finding that the transportation by Jones constituted a subterfuge and was not authorized by its Certificate and appended a Cease and Desist Order to become effective July 23, 1962. Reconsideration was denied and Division 1, acting as an Appellate Division, by Order of December 4, 1962, denied Jones' Petition and established January 25, 1963 as the effective date of its prior Cease and Desist Order. The "Report of the Commission" and the Order of Division 1, acting as an Appellate Division, consolidated the Complaint against Jones Motor Co., Inc., at MC–C–2732 with another Complaint brought before the I.C.C. by the P.U.C. against National Freight, Inc. and Victory Transportation, Inc., docketed at MC–C–2797, without the proceedings having been consolidated for any purpose whatsoever.

Jones then filed the instant Complaint with this Court seeking a reversal of the Order in question.

■ We agree with the plaintiff that the Commission's Order is not supported by substantial evidence and must be reversed.

It is interesting to note that the Commission in its Report at p. 612 adopted the Examiner's statement of the facts, and rulings on evidence, such as, his allowance of certain exhibits which proved the interstate character of the other 108 shipments commingled with the challenged 22 shipments from the same consignors destined for Pennsylvania points. Division 1 also agreed with the Examiner's finding that the tacking by Jones of its two interstate authorities was lawful and proper. (p. 613)

In the two cases involving National Freight, Inc. and Victory Transportation, Inc., combined with Jones, the Commission noted that Victory obtains 75 percent of its revenue in handling freight originating in the Philadelphia area to other points in Pennsylvania without any authority from the P.U.C. (p. 614), while Jones stated at the hearing on this matter that less than five percent of its business concerns such challenged transportation (N.T. 13–14).

While it is stipulated that all of these shipments were routed through New Jersey, and were therefore on their face interstate[5] shipments, the P.U.C. and the I.C.C. take the position that they were clearly intrastate because they could have been moved over direct routes, thereby never leaving Pennsylvania. Service. Storage & Transfer Co. v. Virginia, 359 U.S. 171, 175, 79 S.Ct. 714, 3 L.Ed.2d 717 (1959).

The only testimony offered to prove bad faith or subterfuge were the statements by officers of the intervenors, Modern Transfer Co. and Highway Express Lines, as to the use of Pennsylvania routes by their companies because they were more logical and practical for *their* operation. Also, there was testimony by a Mr. Duffy who had a conversation with one of Jones' drivers who stated that he had been making the trip for approximately five years, five nights per week over the routes covered by the stipulation mentioned above. An investigator for the P.U.C. gave testimony which the Examiner regarded as merely cumulative to Mr. Duffy's testimony and unrelated to any date mentioned in the Complaint.

Apart from this testimony offered by the P.U.C. to support its position that Jones' routes were circuitous, and somewhat long, no direct evidence of bad faith on the part of Jones was offered by the P.U.C. Service Storage & Transfer Co. v. Virginia, supra, 359 U.S. p. 175, 79 S.Ct. p. 717.[6]

Conversely, Jones was specifically authorized to combine its Certificates in

---

5. 49 U.S.C.A. § 303(10) defines "interstate commerce" as including "commerce * * * between places in the same State through another State * * *." 49 Stat. 544.

6. The Supreme Court dealt with this identical situation with these words:
"* * * Aside from the testimony of highway officers as to the actual shipments, none of which is disputed, the

proceedings at MC–F–4955 by these words:

"Upon consummation of the purchase, Jones Motor Co., Inc., will be entitled to operate under the operating rights granted in No. MC–108161, which rights are herein authorized to be unified with rights otherwise confirmed in it and to be embraced in a certificate in its name, with duplications eliminated * * *."[7]

Jones also proved that it provided a complete and economical transportation service to its customers by Exhibits 7, 8, 9 and 10, which show that the same consignors are served at the same time on traffic going to other points and that all of this traffic can be picked up at one time. By this nightly terminal to terminal road run Jones can assure its customers morning delivery via local peddle runs which would be handled in the daytime because the businesses then would be open to receive freight (Ex. 12).

■ The burden of proof on the subterfuge question is placed upon the P.U.C., not on Jones which admittedly is operating under validly combined Certificates. Since the Commission, in its Order, bottomed its finding of bad faith solely upon the circuity of routing by Jones after agreeing with the Examiner in most respects, we must reject this unwarranted conclusion and adopt the Examiner's "Corrected Report and Recommended Order."

■ ■While it is solely within the province of the Commission to determine that any carrier has abused its Certificate,[8] such abuse is not shown when a carrier makes an authorized use of his unrestricted certificates which the Commission admits are validly tacked. The

Commission's Order really says that while Jones is making an authorized use of its validly tacked certificates such use was unforeseen by the Commission when it granted Jones this authority. If the Commission feels that this unforeseen use violates the law of Pennsylvania, proper procedures are available to correct this situation. Congress has provided the remedy in 49 U.S.C.A. § 312 (a), which states in part as follows:

" * * * Any such certificate, permit, or license may, * * * upon complaint, or on the Commission's own initiative, after notice and hearing, be suspended, changed, or revoked, in whole or in part, for willful failure to comply with any provision of this chapter, or with any lawful order, rule, or regulation of the Commission promulgated thereunder * * *."

In Castle v. Hayes Freight Lines, 348 U.S. 61, 65, 75 S.Ct. 191, 193, 99 L.Ed. 68 (1954), the Supreme Court construed the above section 312(a) as follows:

" * * * If, therefore, motor carriers persistently and repeatedly violate the laws of a state, we know of no reason why the Commission may not protect the state's interest, either on the Commission's own initiative or on complaint of the state."

This doctrine was reaffirmed by the Supreme Court in Service Storage & Transfer Co. v. Virginia, supra.

Therefore, the Commission cannot by its Order take away from Jones part of its certificated authority without following the direction of Congress as contained in 49 U.S.C.A. § 312(a), which provides the appropriate remedy to protect a state's interests by changing a certificate in whole or in part.

---

Commonwealth's evidence consisted solely of maps substantiating its position that petitioner's routes were circuitous and often long, sometimes exceeding twice the shortest possible route. However, it offered no direct evidence of bad faith on the part of petitioner in moving its traffic through Bluefield, West Virginia."

7. Modern Transfer Co., Intervenor herein, was a protestant to the acquisition by Jones of this Sub 7 authority (Ex. 5).

8. Service Storage & Transfer Co. v. Virginia, supra, 359 U.S. at p. 179, 79 S.Ct. at 719.

## ORDER

And Now, this 4th day of June, 1963, it is ordered by this Court that the Order of the Interstate Commerce Commission requiring Jones Motor Co., Inc., to Cease and Desist from the challenged operations between points in Pennsylvania through points in New Jersey is reversed.

GANEY, Circuit Judge (dissenting).

A judicial review of the Order of the Interstate Commerce Commission is limited to the inquiry of whether or not there is a rational basis for the conclusions reached and approved by it. Illinois Central Railroad v. Interstate Commerce Commission, 206 U.S. 441, 454–455, 27 S.Ct. 700, 51 L.Ed. 1128; United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535–536, 66 S.Ct. 687, 90 L.Ed. 821.

The facts material to the disposition of the issue here in question are not in dispute. Shipments, approximating some 22 in number, were made during the months of May and June, 1957, by the plaintiff between points in Pennsylvania to certain other points in Pennsylvania. Eleven of these shipments were made from Philadelphia to Allentown, 4 from Easton to Philadelphia and Hatboro, 3 from Bethlehem to Philadelphia, 1 from Chester to Bethlehem, and the others to points from Philadelphia to points within 25 miles of Allentown. To give an example of the shipments, the majority of them moved from Philadelphia over the Tacony-Palmyra Bridge, over U. S. Highway 1 to Trenton, from there over New Jersey Highway 69 to Clinton and then over U. S. Highway 22 to Allentown, which has been designated the Clinton Route. The terminal to terminal distance from Philadelphia to Allentown over this route is 96.2 miles and the driving time is three hours, whereas the driving time between Philadelphia and Allentown over U. S. Highway 309, within Pennsylvania, is two hours, five minutes, and over the Pennsylvania Turnpike, a distance of 75 miles, the driving time would be one hour,

fifty minutes. These shipments were made at night and left Philadelphia traversing the route here indicated, making no stops whatsoever en route, either at Trenton or at Clinton—the terminal at Clinton no longer was in existence, it having been closed more than nine years previously—for any pickups or deliveries. The goods in question were mingled with other goods destined for points beyond Pennsylvania, but after traversing the certificated route of the Commission, the first stop was made in Allentown and the goods destined for delivery there were removed and the balance of the shipment continued on. The record discloses no logical reason or economic purpose for the carrying of the goods across the state line into New Jersey on a certificated route and, accordingly, the Commission reached the conclusion that the transportation was merely subterfuge to avoid compliance with the Pennsylvania Public Utilities Commission regulation which had denied to plaintiff a certificate.

The majority relies heavily on Service Storage & Transfer Co., Inc. v. Virginia, 359 U.S. 171, 79 S.Ct. 714, 3 L.Ed. 2d 717. There, the shipment of goods was from Virginia into West Virginia and back again to Virginia for delivery within the State of Virginia. However, there was a principal terminal of the company in Bluefield, West Virginia, where the truck stopped, pickups were made, deliveries were made and the goods, together with other interstate shipments, were returned into Virginia for delivery. Here, there was good reason, as well as economic purpose, in making the transportation, because other goods were picked up in Bluefield and deliveries made therefrom. Full loads were then made up and carried back into Virginia and on into other states, as contrasted with the non-stop performance of the truck, in this instance, going directly from Philadelphia to Clinton and back into Pennsylvania to Allentown.

While there can be no denial that the concept of interstate commerce embraces

a movement between points in one state through another state, the transportation so performed must not be in bad faith to escape the proper jurisdiction of the terminal state. Eichholz v. Public Service Commission of Missouri, 306 U.S. 268, 274, 59 S.Ct. 532, 83 L.Ed. 641.

It is submitted the report and order of the Commission represent a valid exercise of its authority and that they are predicated upon adequate evidence and findings and the Commission's actions should be sustained.