SERVICE STORAGE & TRANSFER CO.,
INC., *v.* VIRGINIA.

No. 92.   Argued February 26, 1959.—Decided March 30, 1959.

*Francis W. McInerny* argued the cause and filed a brief for petitioner.

*Robert D. McIlwaine, III*, argued the cause for respondent. On the brief were *A. S. Harrison, Jr.*, Attorney General of Virginia, and *Reno S. Harp, III*, Assistant Attorney General.

*Austin L. Roberts, Jr.* and *R. Everette Kreeger* filed a brief for the National Association of Railroad and Utilities Commissioners, as *amicus curiae*, urging affirmance.

MR. JUSTICE CLARK delivered the opinion of the Court.

Petitioner, an interstate motor carrier certificated by the Interstate Commerce Commission, but without a permit from Virginia allowing intrastate operations, was fined $5,000 by the State Corporation Commission for carrying 10 shipments of freight alleged to have been of an intrastate character and, therefore, in violation of Chapter 12, Title 56, of the Code of Virginia.[1] The shipments in question originated at Virginia points and were destined to Virginia points but were routed through Bluefield, West Virginia, where petitioner maintains its main terminal. They were transported in a vehicle with freight destined to points outside of Virginia. Upon arrival at Bluefield the freight destined to Virginia was removed and consolidated with freight coming to the

---

[1] Va. Code, 1950, § 56-278, provides:

"No common carrier by motor vehicle or restricted common carrier by motor vehicle not herein exempted shall engage in intrastate operation on any highway within the State without first having obtained from the Commission a certificate of public convenience and necessity authorizing such operation, and a statement of the State Highway Commission that the law applicable to the proposed route or routes has been complied with as to size, weight, and type of vehicles to be used, and a like statement as to any increase in size, weight, and type of vehicles proposed to be operated by the applicant after such application is granted."

terminal from non-Virginia origins. It then moved back into Virginia to its destinations. The Corporation Commission found that the routes thus employed through Bluefield were a subterfuge to evade state law. The Virginia Court of Appeals agreed but directed that the fine be reduced to $3,500 because of a failure of the Commonwealth's case on three of the shipments. 199 Va. 797, 102 S. E. 2d 339. Petitioner pleads that Virginia's interpretation of its operations conflicts with its interstate certificate as well as an interpretation thereof by the Interstate Commerce Commission. It claims that respondent was without power thus to impose criminal sanctions on its certificated interstate operations. We granted certiorari, 358 U. S. 810, to test out the conflicting contentions. We agree with the petitioner that under the facts here the interpretation of petitioner's interstate commerce certificate should first be litigated before the Interstate Commerce Commission under the provision of § 204 (c) of the Interstate Commerce Act, 49 U. S. C. § 304 (c).[2]

Petitioner operates its truck lines in parts of Virginia and West Virginia. Its activity is carried on under a certificate of convenience and necessity issued by the Interstate Commerce Commission. The petitioner's pres-

---

[2] That section provides:

(c) "Upon complaint in writing to the Commission by any person, State board, organization, or body politic, or upon its own initiative without complaint, the Commission may investigate whether any motor carrier or broker has failed to comply with any provision of this chapter, or with any requirement established pursuant thereto. If the Commission, after notice and hearing, finds upon any such investigation that the motor carrier or broker has failed to comply with any such provision or requirement, the Commission shall issue an appropriate order to compel the carrier or broker to comply therewith. Whenever the Commission is of opinion that any complaint does not state reasonable grounds for investigation and action on its part, it may dismiss such complaint." 49 U. S. C. § 304 (c).

ent I. C. C. certificate is a combination of its original 1941 certificate and a second certificate issued in 1943 upon its purchase of the operating rights of another carrier. Neither it nor its predecessor held a certificate from the State Corporation Commission authorizing any intrastate carriage. It is authorized under the relevant parts of its interstate certificate to transport general commodities as a motor common carrier in interstate commerce:

> "Between Bluefield, Va., Bluefield, W. Va., and points and places within five miles of Bluefield, W. Va.
> "Between Bluefield, Va., and points and places within five miles of Bluefield, Va., and those within five miles of Bluefield, W. Va., respectively, on the one hand, and, on the other, points and places in that part of Virginia and West Virginia within 75 miles of that territory. Between Bluefield, W. Va., on the one hand, and, on the other, points and places in West Virginia, that part of Virginia west of U. S. Highway 29 and south of U. S. Highway 60 including points and places on the indicated portions of the highways specified, and that part of Virginia north of U. S. Highway 60 which is within 80 miles of Bluefield, W. Va."

Petitioner's method of operation is uncontradicted in the record. It maintains its headquarters in Bluefield, West Virginia, and terminal points in Virginia at Bristol and Roanoke. Its main activity is the movement of freight of less-than-truckload shipments. In order to gather the shipments and, by combining them, make up a full truck load it operates "peddler runs" from its Virginia terminals which serve as pick ups for freight in the vicinity. All of the traffic is directed through the Bluefield, West Virginia, terminal. About three percent of the traffic consists of shipments destined from one Virginia point to another while the remainder is directed

from points within to those outside that State. The freight gathered by the "peddler runs" is combined at a terminal and placed in an "over the road" tractor trailer unit and carried to Bluefield, West Virginia. There it is broken down and combined with other shipments received from all of the other runs of petitioner. That part destined to points in and around Bluefield is delivered locally through "peddler runs" operated from that terminal. The remainder is sorted out for forwarding to the terminal nearest its destination and is "filed out" by "over the road" operation. Upon arrival at the latter terminal it is delivered by "peddler runs" to its local destination.

The Commonwealth's criminal case is bottomed on shipments the origin and final destination of which are in Virginia. While it stipulated that all of these shipments were routed through Bluefield, West Virginia, and were, therefore, on their face interstate shipments,[3] Virginia takes the position that they were clearly intrastate in character because had they been moved over direct routes none would ever have left the Commonwealth. It contends that petitioner's circuitous and unnecessarily long routes were a mere subterfuge to escape intrastate regulation and evade its jurisdiction. Aside from the testimony of highway officers as to the actual shipments, none of which is disputed, the Commonwealth's evidence consisted solely of maps substantiating its position that petitioner's routes were circuitous and often long, sometimes exceeding twice the shortest possible route. However, it offered no direct evidence of bad faith on the part of petitioner in moving its traffic through Bluefield, West Virginia.

On the other hand, petitioner offered the testimony of its manager and others as to the bona fides of its opera-

---

[3] 49 U. S. C. § 303 (10) defines "interstate commerce" as including "commerce . . . between places in the same State through another State, . . . ." 49 Stat. 544.

tion. It proved that it and its predecessor-operator had been carrying on its business in Virginia in a similar manner for many years and that it enjoyed certificates from the Interstate Commerce Commission authorizing its operations. Petitioner admits that some of its routes are circuitous but claims this is because of its method of gathering less-than-truckload shipments regardless of final destination and routing them through its "gateway" terminal at Bluefield where they are assorted according to final destination. It stands uncontradicted that its operation is not only practical, efficient and profitable, but also that the creation of this "flow of traffic" is a time-saver to the shipper since there is less time lost waiting for the making up of a full truck load. It also claims a unique service for less-than-truckload shipments of central Virginians who ship commodities to southwest Virginia and Kentucky and who otherwise would suffer long delays on deliveries or would be obliged to ship by special truck at higher rates. While these considerations are not controlling, they throw light on petitioner's claim of bona fides.

In *Castle* v. *Hayes Freight Lines*, 348 U. S. 61, 63–64 (1954), we observed that "Congress in the Motor Carrier Act adopted a comprehensive plan for regulating the carriage of goods by motor truck in interstate commerce." We pointed out that 49 U. S. C. § 312 provides "that all certificates, permits or licenses issued by the Commission 'shall remain in effect until suspended or terminated as herein provided'. . . . Under these circumstances, it would be odd if a state could take action amounting to a suspension or revocation of an interstate carrier's commission-granted right to operate." To uphold the criminal fines here assessed would be tantamount to a partial suspension of petitioner's federally granted certificate. Even though the questioned operations constitute only a minor, *i. e.*, three percent, portion of the petitioner's business, that

portion is nevertheless entitled to the same protection as are the other operations which are conducted under the certificate. In fact, the method of handling is identical and the freight is often transported in the same vehicle. The certificate on its face covers the whole operation. In fact, in 1953, in approving the acquisition of petitioner by another carrier, the I. C. C. expressly approved the very type of operation now being carried on. In its unpublished report, the Commission noted:

"Under its existing authority, Service Storage may lawfully perform a cross-haul service under a combination of its radial rights by operating, for example, between points in West Virginia within 75 miles of the base area, on the one hand, and, on the other, points in Virginia on and west of U. S. Highway 29 and on the south of U. S. Highway 60, and points in the three Kentucky counties provided such operations under a combination of the various rights are routed through Bluefield as a gateway." MC–F–5361, *Smith's Transfer Corporation of Staunton, Va.—Control—Service Storage and Transfer Company, Inc.,* 59 M. C. C. 803 (report not published.)

It appears clear that interpretations of federal certificates of this character should be made in the first instance by the authority issuing the certificate and upon whom the Congress has placed the responsibility of action. The Commission has long taken this position. Compare *Atlantic Freight Lines, Inc.,* v. *Pennsylvania Public Utility Comm'n,* 163 Pa. Super. 215, 60 A. 2d 589, with *Atlantic Freight Lines, Inc.—Petition for Declaratory Order,* 51 M. C. C. 175. The wisdom of such a practice is highlighted by the facts of this case. Between the close of the hearing, and the announcement of the Virginia Commission's decision, Service petitioned the I. C. C. for a declaratory order interpreting its certificate. The

Commonwealth, although it had notice of the I. C. C. proceeding, elected not to participate. After the Virginia Commission had found petitioner to be operating in intrastate commerce and fined it for such operation, the I. C. C. issued an opinion, 71 M. C. C. 304, in which it construed petitioner's certificate as authorizing Virginia-to-Virginia traffic routed through Bluefield, West Virginia.[4] This was but a reaffirmation of its prior interpretation of the certificate. 59 M. C. C. 803, *supra*. Such conflicts can best be avoided if the interpretation of I. C. C. certificates is left to the Interstate Commerce Commission.

Nor is *Eichholz* v. *Public Service Comm'n*, 306 U. S. 268 (1939) to the contrary. There Missouri revoked a carrier's interstate permit because it crossed state lines into Kansas City, Kansas, for the sole purpose of *creating* an interstate operation. Eichholz, however, had no certificate from the Interstate Commerce Commission, and this Court's opinion was premised on this fact rather than that the interstate operations were merely a subterfuge and hence not bona fide. The words of Chief Justice Hughes there clearly distinguish that case from the present:

"When the [Missouri] Commission revoked the permit, the Interstate Commerce Commission had not acted upon appellant's application under the Federal

---

[4] In its declaratory opinion the Commission noted:
"In the absence of any showing that petitioner's use of its authorized route is a subterfuge to avoid State regulation, or other than a logical and normal operation through the carrier's headquarters, we are of the opinion that petitioner's operations, in the manner described, constitute bona fide transportation in interstate commerce.

. . . . . .

"We find that the operations described between points in Virginia through Bluefield, W. Va., are bona fide operations in interstate commerce within the authority granted to petitioner in certificate No. MC—30471." *Service Storage & Transfer Co., Inc.—Petition for Declaratory Order*, 71 M. C. C. 304, 306.

Motor Carrier Act and meanwhile the authority of the state body to take appropriate action under the state law to enforce reasonable regulations of traffic upon the state highways had not been superseded." 306 U. S., at 273.

*Eichholz* followed naturally from the holding of the Court in *Welch Co.* v. *New Hampshire,* 306 U. S. 79 (1939), that the enactment of the Motor Carrier Act did not, without more, supersede all reasonable state regulation, the latter continuing in effect until the Interstate Commerce Commission acted on the same subject matter. That it has admittedly done here.

Finally, the Commonwealth is not helpless to act. If it believes that petitioner's operation is not bona fide interstate but is merely a subterfuge to escape its jurisdiction, it can avail itself of the remedy Congress has provided in the Act. Section 204 (c), *supra,* note 2, authorizes the filing of a "complaint in writing to the Commission by any . . . State board . . . [that] any . . . carrier . . ." has abused its certificate. See also *Castle* v. *Hayes Freight Lines, supra.* Thus the possibility of a multitude of interpretations of the same federal certificate by several States will be avoided and a uniform administration of the Act achieved.

The judgment is

*Reversed.*