**GEORGE TRANSFER AND RIGGING COMPANY, INCORPORATED,**
Plaintiff,

v.

**UNITED STATES of America and Interstate Commerce Commission,**
Defendants.

Civ. A. No. 71–1114–Y.

United States District Court,
D. Maryland.

Argued March 1, 1974.

Decided May 2, 1974.

Francis W. McInerny, Washington, D. C. (T. Bayard Williams, Jr., Baltimore, Md., John Guandolo, Peter A. Fitzpatrick and MacDonald & McInerny, Washington, D. C., on brief), for plaintiff.

Richard H. Streeter, Atty., Interstate Commerce Commission (Thomas E. Kauper, Asst. Atty. Gen., John H. D. Wigges, Atty., Dept. of Justice, George Beall, U. S. Atty., and Fritz R. Kahn, Gen. Counsel, Interstate Commerce Commission, on brief), for defendants.

Before WINTER, Circuit Judge, and KAUFMAN and YOUNG, District Judges.

WINTER, Circuit Judge:

Convened as a three-judge court in accordance with 28 U.S.C. § 2325, we are asked to enjoin, annul and set aside two orders of the Interstate Commerce Com-

mission which have the effect of prohibiting George Transfer and Rigging Company, Incorporated (George Transfer) from transporting "pig iron," or "ferro-alloys" on pallets, as a common carrier by motor vehicle under operating certificates theretofore issued to it. We deny the requested relief.

## I.

George Transfer's operating certificate, obtained under the grandfather clause of the Motor Carrier Act, 49 U.S.C. § 306, authorizes it to transport

> building and contractors' equipment, materials and supplies; machinery and machine parts; pipe line and plant construction materials and supplies; steel; and also heavy and bulky articles generally requiring rigging, special equipment, or specialized handling, between points and places in Maryland, Delaware, Pennsylvania, New Jersey, New York, Virginia, West Virginia, Kentucky, Ohio, and the District of Columbia.

Because its right to transport pig iron and ferro-alloys on pallets under these commodity and service descriptions was questioned by the Commission's field staff, George Transfer sought from the Commission a declaratory order, or, alternatively, an interpretive order, confirming its claimed right. George Transfer's petition alleged that it had transported these commodities for a "long period" and that George Transfer believed that it had acted within its right. The petition was not verified, nor were supporting affidavits annexed. An order issued August 10, 1970, in which the Commission denied its petition without a hearing. Summarized, the reasons assigned in the order were that: (a) while pig iron and ferro-alloys may be fabricated into commodities that George Transfer was authorized to carry, they are not in a form useable as such commodities (building and contractors' equipment, materials and supplies, and pipe line and plant construction materials and supplies) and therefore they do not fall into those descriptions; (b)

"steel" does not embrace iron and iron products including pig iron and ferro-alloys; (c) the authority to transport "heavy and bulky articles generally requiring rigging, etc." authorizes operations as a heavy hauler; and (d) a heavy hauler is not authorized to carry ferro-alloys or pig iron because neither is heavy nor bulky, nor of a nature requiring aggregation on palletizing. The reasons for these conclusions were supplied by citation to relevant prior decisions of the Commission involving other carriers.

George Transfer then petitioned for reconsideration of the August 10, 1970 order, and for rehearing, by a petition containing several proffers of proof. First it tendered evidence that, on the "grandfather" date (October 1, 1935), it was a recognized carrier of a wide variety of iron and steel and iron and steel products, so that, George Transfer argued, the designation "steel" as an authorized commodity in its operating certificate was intended to include a wider variety of products than subsequent Commission interpretations of the generic term "steel" encompass. Second, George Transfer asserted the right to carry pig iron and ferro-alloys under the service description of its operating certificate. This argument was premised on the use of the word *"generally"* against the background that on the grandfather date George Transfer performed a wide variety of services different from those of the usual heavy haulers; and therefore the word "generally" was used to permit George Transfer to continue to perform broad and comprehensive operations.

As a third ground for reconsideration, George Transfer tendered proof that ferro-alloys, with rare exception, were always carried in bulk or in pallet boxes; that carriage in small packages or containers was not economically feasible for a shipper; and that, moreover, the chemical properties of certain ferro-alloys required that they be carried in lined and sealed pallet-boxes, all with the result that special equipment in loading

and unloading is necessary. Thus, George Transfer sought to demonstrate that the requirements of its service description authority were literally met.

Finally, with regard to transportation of pig iron, George Transfer tendered proof that loading with magnetic cranes has been the exclusive practice in the industry for at least fifty years and that manual loading is both economically prohibitive and extremely hazardous. It follows, so George Transfer asserts, that pig iron required special equipment and was within its service description authority.

By order of August 10, 1971, again issued without a hearing, the Commission denied the petition for consideration. This order and its predecessor of August 10, 1970, are the orders before us on review.

## II.

■■ On its merits, George Transfer's case raises various aspects of the ultimate question of what may a "heavy hauler" carry? A "heavy hauler" is a carrier authorized to haul commodities that "by reason of size or weight require the use of special equipment"—in short, because of their inherent qualities. In contrast, a "general commodity hauler," which is restricted from engaging in heavy hauler carriage, may transport all goods except those which require special equipment for their transportation. Classification of Motor Carriers of Property, 2 M.C.C. 703, 709–10 (1937). Both from the nature of the commodities specified in George Transfer's certificate of public convenience and necessity, and the service description employed, George Transfer is a "heavy hauler." Specifically, the instant case presents the question of whether pig iron or ferro-alloys on pallets are within permissible categories of commodities that a heavy hauler may carry.

Since the enactment of the Motor Carrier Act, the Commission has concerned itself from time to time with the deline-

ation of commodities of permissible carriage by heavy haulers from commodities of permissible carriage by general commodity carriers. The delineation has not been an easy one, especially as the technology of loading, unloading and carriage, and shippers' preferences and shippers' requirements have changed since 1935. It may be fairly said, also, that from a close reading of the Commission's views in its reported opinions, there has not been unwavering consistency in approach of how to classify commodities between the two categories of carriers. In Ace Doran Hauling & Rigging Co., Investigation, 108 M.C.C. 717 (1969), the Commission undertook to re-examine and restate its views on the subject. After extended discussion, it summarized its position as follows (108 M.C.C. at 757):

(1) With respect to bundled, aggregated or palletized commodities, the presumption described in the *Dillner* case, 79 M.C.C. 335, at 358—that such shipments, in the absence of a sound basis for a contrary conclusion, are outside the scope of heavy-hauler authority—is reaffirmed without modification.

(1a) That, again in accordance with *Dillner*, exceptions to the foregoing general rule will not be recognized when the use of aggregation is attributable *solely* to considerations relating to economy and efficiency; but, once a commodity's "inherent nature" is found to necessitate aggregation, the latter concepts must be taken into account in determining the minimum sized bundle required.

(2) That irrespective of whether they are tendered in aggregated or single-unit form, commodities such as classes A and B explosives, bulk commodities, or household goods, are likewise presumed in accordance with the *International Investigation* case, 108 M.C.C. 275, to be without the permissible scope of heavy-hauler service, and that in these cases exceptions will be recognized only when a clear basis is shown therefor.

(3) That future determinations as to whether the presumptions set forth in (1) and (2) above have been overcome as well as those regarding the status under size and weight authority of individually shipped articles generally should be guided by a balanced consideration of the following factors: (a) the commodity's basic characteristics, (b) industry-wide (not individual shipper) practices with regard to its handling, (c) prior methods employed in shipment of the involved or an analogous commodity, and (d) its traditional sphere of carriage.

*Ace Doran* was affirmed by a split decision in Pittsburgh & New England Trucking Co. v. United States, 345 F. Supp. 743 (W.D.Pa.1972), and the decision of that court was affirmed in United States v. Interstate Commerce Commission, 409 U.S. 904, 93 S.Ct. 235, 34 L.Ed.2d 169 (1972) (Per Curiam), and Ace Doran Hauling & Rigging Co. v. Interstate Commerce Commission, 409 U.S. 1070, 93 S.Ct. 686, 34 L.Ed.2d 660 (1972) (Per Curiam). *Ace Doran* considered the proper classification of a variety of commodities, not including, however, pig iron and ferro-alloys; but the principles it restated are the basic authority by which our decision is governed. Accordingly, we turn to application of the principles of *Ace Doran* to each of the classes of commodities which George Transfer has been denied permission to carry. We do so in regard to the facts contained in the affidavits supporting the petition for reconsideration.

■ A. Pig iron. The pig iron George Transfer seeks to carry comes in units of 40-pound iron pigs and 12.5 pound iron pigs. While it may unquestionably be cheaper and more efficient to transport it in dump trucks and to employ automated loading and unloading by magnetic cranes, it cannot be said that units of this commodity, by size or weight, *require* automated handling. Thus, the first factor of the *Ace Doran* test to overcome the presumption that the commodity is outside the scope of heavy hauler authority—("the commodity's basic characteristics"), described in *Pittsburgh & New England Truck Co.,* 345 F.Supp. at 753, as "properly . . . [the] primary regard . . . ."—was not met. Moreover, George Transfer tendered little evidence with regard to the second factor, that of "industrywide (not individual) shipper practices with regard to . . . [pig iron's] handling . . . ." Three affidavits bear on this factor, one of George Transfer's officers, and those of officers of two shippers. George Transfer's officer stated that it has had three customers for which it transported pig iron, and it always loaded shipments by magnetic crane. From his affidavit, it is unclear when and over what period of time pig iron, as distinguished from other iron products, was transported. The affidavits of the two shippers set forth, collectively, that pig iron had been loaded by magnetic cranes for at least 35 years, and probably 50, that it is not feasible economically to load manually, the manual loading is dangerous, and that dump trucks are used because they are not damaged if the magnetic crane drops part of the load, they can serve customers who do not have rail service, and truckers give better service than rail carriers. While the tendered proof has relevance as to what may be the industry practice, it can hardly be described as evidence of *industry* practice, as distinguished from the practice of three specific customers.

The three affidavits above described have relevance also to the third and fourth factors of the *Ace Doran* test— "prior methods employed in shipment" (historic methods of handling) and "traditional sphere of carriage" (field of service). But the shipper's affidavits, collectively, suggest that transportation of pig iron by motor carrier is largely a recent development and that previously rail transportation was the principal carriage employed. One is specific in setting out, "It is only in the last ten years that extensive use has been made of truck service. Increased use of

trucks was started due to poor rail service, customers' desire to reduce inventory, and the ability of trucks to dump unload at the most convenient places on our customers' property." It would therefore appear that the first two factors in the *Ace Doran* test are the important ones, and the proof tendered did not sufficiently establish them to overcome the presumption that pig iron is not within the scope of the usual heavy hauler's authority.

■ . B. Ferro-Alloys on · Pallets. George Transfer has transported ferro-alloys for approximately four years. The shipments are palletized, either in pallet boxes or in drums on pallets. The units weigh 1,500–4,000 pounds and must be loaded and unloaded by cranes or fork lifts. They are carried on flatbed trailers.

While the affidavit of a vice president of George Transfer represents that it is his understanding that palletization of ferro-alloys, with the consequent need of special loading and unloading equipment, is an industrywide practice, the affidavit of the traffic manager of Ohio Ferro-Alloys Corporation establishes both that ferro-alloys may be shipped in small bags or small containers, not requiring special equipment, and in fact some such shipments are made, even though they are rare. The affidavit also discloses that until the early 1940's this commodity was generally shipped by rail, in container cars or gondola cars, but that a transition to truck transportation resulted from slow train service, customers' demands for faster delivery so as to reduce inventories and ease of delivery to customers not having rail sidings, that palletized loading and unloading by the use of special equipment is markedly cheaper than manual handling, and that certain ferro-alloys must be containerized to protect them against moisture which would cause them to explode. It is significant also that early in the transition of transportation, by train to transportation by truck, truck shipments were carried in dump trucks with mixed shipments separated by the use of one or more separator panels. The practice was discontinued after trailers overturned in the unloading process when they became unbalanced after partial discharge.

It would seem clear that George Transfer did not tender evidence to show that the basic characteristics of ferro-alloys required their transportation by heavy haulers so as to meet the first factor of the *Ace Doran* test to overcome the presumption that heavy haulers lack authority to carry this commodity, and this would be sufficient reason to classify the commodity as one to be carried by general commodity carriers. It should be noted that general commodity carriers may use special loading equipment and their customers may use special unloading equipment. Even if the indications are that, industry-wide, special loading and unloading equipment is customarily employed, George Transfer's proffered evidence of prior practices of handling proves little except to show that handling of ferro-alloys by motor vehicle is a relatively new concept and appropriate for classification. It cannot be within the traditional sphere of carriage for a heavy hauler because the Commission has twice held to the contrary. W. J. Dillner Transfer Co., Extension-Ferro-Alloys, 84 M.C.C. 809 (1960). W. J. Dillner Transfer Co., Extension-Alloys, 91 M.C.C. 667 (1962).

In sum, we conclude on the merits, accepting the evidence tendered by George Transfer as proved, that by the *Ace Doran* criteria, which we deem binding on us, there was substantial evidence to support the Commission's conclusion that the presumption that carriage of pig iron and ferro-alloys on pallets was outside of a heavy hauler's certificate of public convenience and necessity was not overcome, and that the resulting classification made was not arbitrary, capricious and unreasonable.

### III.

We consider next the contentions that "steel" as a commodity designation and

the use of the word "generally" in the service designation authorize George Transfer to provide transportation for the commodities in question, even if the usual heavy hauler may not.

■■ The law is settled that interpretation of a certificate of public convenience and necessity is a matter for the Commission in the first instance, and the Commission's determination will not be set aside unless that determination is capricious or arbitrary, or constitutes an abuse of discretion, or contravenes an established principle of law. Service Storage & Transfer Co. v. Virginia, 359 U.S. 171, 177, 79 S.Ct. 714, 3 L.Ed.2d 717 (1959); Andrew G. Nelson, Inc. v. United States, 355 U.S. 554, 558, 78 S.Ct. 496, 2 L.Ed.2d 484 (1958); *Pittsburgh & New England Trucking Co.,* supra, 345 F.Supp. at 752; Beeline Express, Inc. v. United States, 308 F. Supp. 721, 724 (D.Colo.), aff'd mem., 398 U.S. 955, 90 S.Ct. 2170, 26 L.Ed.2d 539 (1970); U.S.A.C. Transport, Inc. v. United States, 235 F.Supp. 689, 692 (D. Del.1964), aff'd 380 U.S. 450, 85 S.Ct. 1103, 14 L.Ed.2d 151 (1965) (Per Curiam); W. J. Dillner Transfer Co. v. I. C.C., 193 F.Supp. 823, 825–826 (W.D. Pa.1961), aff'd, 368 U.S. 6, 82 S.Ct. 16, 7 L.Ed.2d 16 (1961) (Per Curiam). Moreover, when the Commission has interpreted a certificate, its interpretation, unless it may be set aside under the principle previously stated, does not result in a depreciation or diminution of the subject authority in violation of the procedure required by 49 U.S.C. § 312(a); it constitutes a declaration of the rights that the carrier had from the beginning. *Nelson,* supra, 355 U.S. at 558–559, n. 9, 78 S.Ct. 496. *U.S.C.A. Transport,* supra, 235 F.Supp. at 692, 694; Simpson v. United States, 200 F. Supp. 372, 378 (D.Iowa), aff'd, 369 U.S. 526, 82 S.Ct. 954, 8 L.Ed.2d 83 (1962) (Per Curiam), reh. den., 370 U.S. 914, 82 S.Ct. 1254, 8 L.Ed.2d 406 (1962).

■ We find nothing in the record to indicate that the Commission's determination that the commodity description "steel," in its generic sense, does not include pig iron, is capricious, arbitrary or illegal. The Commission has been consistent in this conclusion. *See* Kaplan Trucking Co. Common Carrier Application, 28 M.C.C. 749 (1941).

■ With respect to the use of the term "generally" in the service description, again we are not persuaded that the Commission acted capriciously, arbitrarily or illegally. As the Commission pointed out in Descriptions in Motor Carrier Certificates, 61 M.C.C. 209, 249 (1952), there is a lack of "uniformity in the commodity descriptions of the heavy haulers and riggers." George Transfer's service description may well be nothing more than what was said in that proceeding—"The commodities transported by . . . [heavy haulers and riggers] *generally* are of such size and weight as to require special devices for their loading and unloading and the use of special equipment for their movement over the road" (emphasis added). 61 M.C.C. at 248. In any event, we cannot say, under our limited right of review, that we have the right to set aside the Commission's determination when it may be so reasonably explainable.

■ Of course, "steel," as a "grandfather" commodity designation, may include pig iron when viewed in the context of George Transfer's grandfather operations. Similarly, "generally," as a "grandfather" service description, may, when viewed in its historical context, have been intended to include more than just the right, implicit in every heavy hauler authority description, to transport some items that do not absolutely require special devices for their loading and unloading. We do not foreclose either of these possibilities, but they are not before us now. If, in fact, the Commission's interpretation of George Transfer's certificate limits the actual scope of its grandfather operations, George Transfer should seek a reopening of the grandfather proceeding for a modification of its certificate. Andrew G. Nelson, Inc. v. United States, supra,

355 U.S. at 561–562, 78 S.Ct. 496; Mitchell Bros. Truck Lines v. United States, 225 F.Supp. 755, 759 (D.Or. 1963), aff'd, 378 U.S. 125, 84 S.Ct. 1657, 12 L.Ed.2d 744 (1964) (Per Curiam), reh. den., 379 U.S. 872, 85 S.Ct. 19, 13 L.Ed.2d 78 (1964); *Simpson*, supra, 200 F.Supp. at 378–379. The proceeding before the Commission instituted by George Transfer was not of that nature and we cannot say that the Commission acted improperly when it failed to treat the declaratory judgment proceeding as an application to reopen the grandfather proceeding.

### IV.

Finally, we address the two remaining contentions that (1) the Commission's decision does not meet the standards established by the Administrative Procedure Act and by the courts, and (2) the Commission's decision contravenes the national transportation policy as expressed in the Interstate Commerce Act, 49 U.S.C. §§ 1, 301, 901 and 1001.

 We see nothing in the Administrative Procedure Act that requires the Commission to make more detailed findings or assign more specific reasons than it did in the instant case. The Commission's order of August 10, 1970 denied George Transfer's application for declaratory relief. It was not therefore a "decision" within the meaning of § 557(c) which requires "findings and conclusions, and the reasons or basis therefor, on all material issues of fact, law, or discretion presented on the record . . .." Rather, it was a "denial in whole or in part of a written application . . . of an interested person made in connection with any agency proceeding," within the meaning of § 555(e); and as such the Commission was only required, except in affirming a prior denial, to provide "a brief statement of the grounds for denial." Of course the order of August 10, 1971, denying reconsideration, was similarly not a "decision" for which findings and conclusions were required; and since it was

an affirmance of a prior denial, not even a statement of the grounds for denial was required. We have no doubt that the recitals in the order of August 10, 1970, explaining why the Commission concluded to deny relief, satisfied the requirements of § 555(e). Certainly they were sufficient to apprise us fully of the grounds for the Commission's action and manifestly the primary purpose of that statute was that a reviewing court be enabled to smoke out grounds of illegality, capriciousness or arbitrariness on the part of the administrative agency, if any there be.

The case law provides no firmer base for George Transfer's first contention. Alabama G.S.R. Co. v. United States, 340 U.S. 216, 227–228, 71 S.Ct. 264, 95 L.Ed. 225 (1951), holds, in effect, that, in varying contexts, the Commission need make only such findings as are necessary to provide a basis for judicial review, i. e., disclosure of the essential basis of the Commission's decision. This was done. In the order of August 10, 1970, the Commission stated why it concluded that George Transfer was not authorized to carry pig iron and ferro-alloys, and it cited the prior cases in which those reasons were developed at length. Our study of the order and the authorities cited has given us confidence that we sufficiently understand what the Commission decided and the reasons therefor that we have been able fully to perform our role as the reviewing judicial authority and there is not lacking any certainty in our conclusion that there is no basis on which the Commission's orders should be disturbed.

 Little discussion is required of George Transfer's contention that the Commission contravened the national transportation policy as expressed in the Act. The same argument was advanced and rejected by a majority of the court in *Pittsburgh & New England Trucking Co.*, supra. With that court, we agree that "[t]he restriction on competition attributable to the Commission's order is . . . no greater than what is re-

quired and contemplated by the regulatory scheme prescribed by Congress" and "that the order . . . does not really deprive the public of the use of modernized equipment . . . [it] merely prevents utilization of such equipment as a means of expanding the permissible business of one class of carriers, at the expense of another type of carriers." 345 F.Supp. at 756. *See also* W. J. Dillner Transfer Co. v. United States, supra, 193 F.Supp. at 827.

### V.

We conclude that the requested relief should be denied. Counsel are requested to agree upon a form of order in accordance with this opinion and to present it within fourteen days.