908 F.2d 972
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ALLIED DELIVERY SYSTEM, INC.; (89-3383) Alvan Motor
Freight, Inc.; TNT Holland Motor Express, Inc.;
and Parker Motor Freight, Inc., (89-3401)
and
State of Michigan; and Michigan Public Service Commission,
(89-3414) Petitioners-Appellants,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Hover Trucking Company of Michigan, Respondent-Intervenor.
 Nos. 89-3383, 89-3401, 89-3414.
 United States Court of Appeals, Sixth Circuit.
 July 26, 1990.
 
 Before WELLFORD and DAVID A. NELSON, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The petitioners, several intrastate Michigan trucking companies and the state agency regulating such carriers, seek review of an Interstate Commerce Commission decision holding that because certain Michigan-to-Michigan traffic of respondent Hover Trucking Company is routed through a terminal in Indiana, the traffic is interstate transportation subject to regulation only by the ICC. Finding no abuse of discretion or want of substantial evidence to support the ICC's decision, we shall deny the petitions for review.
 
 
 2
 * For 25 years, Hover Trucking Company of Michigan had its headquarters and only terminal in Niles, Michigan, near the Indiana border. Operating under regulatory authorization from the Michigan Public Service Commission ("PSC"), Hover functioned mainly as a local connecting line for interstate carriers in southwest Michigan and northern Indiana.
 
 
 3
 Hover began to expand its operations in 1979, after coming under new ownership, and it received expanded authorizations from the PSC and the ICC. In 1982 Hover established a terminal in Grand Rapids, Michigan. Again it received the requisite expanded authorization from the PSC.
 
 
 4
 Hover acquired a 48-state authorization from the ICC in 1983, at which time the company moved its headquarters to a larger facility in South Bend, Indiana. Hover's president told a newspaper reporter that the move to South Bend would enable the company to serve Michigan customers without obtaining authority from the PSC. Hover subsequently moved into an even larger terminal in South Bend, and added additional "satellite" terminals in Michigan.
 
 
 5
 Hover now operates 25 terminals in Wisconsin, Kentucky, Illinois, Indiana, Ohio, and Michigan. The South Bend terminal serves as a break-bulk terminal, or "hub." Freight is collected and consolidated at Hover's "satellite" terminals, shipped to the South Bend terminal for sorting, and then shipped to a satellite terminal near its destination. Under this system some shipments from one point in Michigan to another point in Michigan are routed through South Bend.
 
 
 6
 Concerned that Hover was soliciting intrastate shipments in Michigan for which it had no authority, the PSC investigated Hover in 1987. The president of Hover claimed that only shipments made under PSC authority went directly between points in Michigan without passing through the Indiana terminal. However, evidence revealed that this was not invariably the case, and some shipments that purportedly went through the South Bend terminal actually never left Michigan. Hover stipulated that such shipments occurred during 1986 without PSC intrastate authorization, and the company agreed to cease those activities. There is no evidence that such shipments continued thereafter.
 
 
 7
 Nevertheless, believing that Hover's shipments through South Bend were merely a subterfuge to avoid state regulation, the PSC filed a complaint against Hover with the ICC, seeking to stop Hover's service between points in Michigan even if routed through Indiana. The complaint alleged that Hover routed its Michigan-to-Michigan shipments through South Bend in bad faith, that Hover did not have a legitimate business purpose for routing such shipments through South Bend, that the routings were unnecessarily circuitous, and that the "intrastate" traffic routed through South Bend was not incidental to Hover's interstate operations. Petitioners Allied Delivery Systems, Inc., Alvan Motor Freight, Inc., TNT Holland Motors Express, Inc., and Parker Motor Freight, Inc., all of which claimed to have lost intrastate business to Hover, joined the challenge to Hover's operations.
 
 
 8
 The ICC found that Hover's shipments from points in Michigan through South Bend to other points in Michigan represented interstate commerce not subject to PSC regulation. In determining that Hover's operations were not a "subterfuge" to avoid intrastate regulation, the Commission found that: (1) the interstate routing of Hover's shipments was not unduly circuitous when compared with the routes of intrastate carriers; (2) there was economic justification for such routing apart from Hover's lack of intrastate authority; and (3) the traffic that would otherwise be intrastate was a small proportion of Hover's overall operations.
 
 II
 
 9
 Congress gave the ICC jurisdiction over interstate transportation, 49 U.S.C. Sec. 10521(a), but forbade it in most cases to regulate intrastate transportation. 49 U.S.C. Sec. 10521(b). Congress also expressed a desire that the ICC cooperate with the states in regulating transportation. 49 U.S.C. Sec. 10101(a)(5).
 
 
 10
 The statute defines neither "interstate" nor "intrastate" commerce. See 49 U.S.C. Sec. 10102. The pre-1978 version of the Interstate Commerce Act, however, defined "interstate commerce" as "commerce between any place in a state and any place in another state or between places in the same state through another state." 49 U.S.C. Sec. 303(a)(10) (repealed). Congress deleted this definition when it revised the Act in 1978, but incorporated identical language in the section delineating the ICC's jurisdiction:
 
 
 11
 "[T]he Interstate Commerce Commission has jurisdiction over transportation by motor carrier ...
 
 
 12
 (1) between a place in--
 
 
 13
 (A) a state and a place in another state;
 
 
 14
 (B) a state and another place in the same state through another state; ...."
 
 
 15
 49 U.S.C. Sec. 10521(a) (emphasis added). See also H.R.Rep. No. 1395, 95th Cong., 2d Sess. 219 (1978) (Master Disposition Table showing that Sec. 303(a)(10) was incorporated into Sec. 10521), reprinted in 1978 U.S.Code Cong. & Admin.News 3009, 3228, and table reprinted in 49 U.S.C.A.Suppl. 816, 821 (1990); H.R.Rep. No. 1395 at 247 (table of Laws Omitted and Repealed indicating that the definition of "interstate operation" contained in Sec. 303(a)(20) was deleted as "unnecessary" because "[t]he chapter on jurisdiction [Secs. 10521 et seq. ] specifies what is meant by interstate commerce"), reprinted in 1978 U.S.Code Cong. & Admin.News 3009, 3256, and table reprinted in 49 U.S.C.A.Suppl. 848, 849 (1990). The PSC has presented neither caselaw nor statutory support for the proposition that the statute permits the ICC to regulate the transportation described in Sec. 10521(a)(1)(B) only so long as it does not interfere with a state's regulation of intrastate transportation. The ICC was well within its jurisdiction.
 
 III
 
 16
 The decision of the Commission should not be set aside by this court unless it is unsupported by substantial evidence, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. Sec. 706(2)(A) and (E). As this court has explained:
 
 
 17
 "If the agency considers the relevant factors and articulates a rational connection between the facts found and the choice made, the decision is not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law and will be upheld if supported by substantial evidence." Film Transit, Inc. v. ICC, 699 F.2d 298, 300 (6th Cir.1983), citing Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285 (1974).
 
 
 18
 As discussed above, it is clear that transportation beginning and ending in the same state but passing through another is interstate commerce. It is equally clear, however, that a carrier may not in "bad faith" use interstate routings as a "subterfuge" to avoid state regulation. Pennsylvania Public Utility Com'n v. Arrow Carrier Corp., 113 M.C.C. 213, 219 (1971) ("Arrow "), aff'd sub nom. Pennsylvania Public Utility Com'n v. United States, 1973 Fed.Carr.Cas. (CCH) p 56206 (M.D.Pa.1973), aff'd per curiam, 415 U.S. 902 (1974). Accord, Gray Lines Tour Co. of Southern Nevada v. ICC, 824 F.2d 811, 814 (9th Cir.1987).
 
 
 19
 The petitioners in the case at bar charge that Hover uses its South Bend terminal in bad faith to avoid state regulation of Michigan-to-Michigan freight, thereby allowing it to offer lower rates than those established by the PSC for intrastate transportation. The complainant has the burden of proof on such an issue, of course. Missouri Public Service Com'n v. Missouri Arkansas Transp. Co., 103 M.C.C. 641, 649 (1967).
 
 
 20
 As the Commission has observed, "[f]ixing the line between a legitimate interstate operation and a bad faith scheme to avoid state regulation has always been a difficult task." Arrow, 113 M.C.C. at 221. The efficiency of an operation is not controlling, but it does shed light on a carrier's bona fides. Service Storage and Transfer Company, Inc. v. Virginia, 359 U.S. 171, 176 (1959). Recognizing this, the Commission will usually test good faith by examining the efficiency or reasonableness of the carrier's actions:
 
 
 21
 "The Commission and the courts, in most of the cases involving an alleged subterfuge, will compare the efficiency of the direct and the circuitous routes. Such a comparison is not the sole test of good faith. Service Storage and Transfer Company, Inc. v. Virginia, [359 U.S. 171, 176 (1959) ]. However, it is usually the best indicator of the carrier's intent because without some compelling reason, a carrier would normally seek and use the most efficient routes available." Rock Island Motor Transit Co. v. Watson-Wilson Transp. System, Inc., 99 M.C.C. 303, 307 (1965), aff'd sub nom. Rock Island Motor Transmit Co. v. United States, 256 F.Supp. 812 (S.D.Iowa 1966).
 
 
 22
 Here the Commission considered each of three factors identified in Arrow as relevant: (1) the degree of "circuity" involved in the questioned route when compared with the local route normally employed by intrastate carriers; (2) the economic or operational justification for such routing; and (3) the proportion of the carrier's overall operation accounted for by the questioned traffic. Arrow, 113 M.C.C. at 220.
 
 
 23
 There is substantial evidence to support the ICC's conclusion that Hover's operation passes muster under Arrow. "No single factor is controlling," id., but it is logical that the importance of the circuity factor should vary in inverse proportion to the strength of the economic or operational justification for the routing.
 
 
 24
 Spoke-and-hub traffic patterns often improve efficiency by decreasing unused capacity. Overnight couriers and airlines provide the best-known examples, but the ICC has long recognized that the use of such patterns may promote the efficient movement of less-than-truckload-lot shipments of freight. See Rock Island, 99 M.C.C. at 306; Missouri Public Service Com'n v. Missouri-Arkansas Transp. Co., 103 M.C.C. 641, 647 (1967); Maudlin v. Southwest Delivery Co., No. MC-C-10930, 1985 Fed.Carr.Cas. (CCH) p 37,198 (Nov. 15, 1985), aff'd without op., 835 F.2d 1435 (9th Cir.1987).
 
 
 25
 Of course, "the mere assertion that operating efficiencies flow from a circuitous operation is not enough." Rock Island, 99 M.C.C. at 307. The ICC looked closely at the economic and operational advantages of Hover's spoke-and-hub system, and found that the nightly volume of intrastate shipments between any two of Hover's Michigan terminals would be only 1,000 to 7,500 pounds. This would not be enough to support nightly direct runs. The average trailer load into or out of South Bend, in contrast, was 22,000 pounds. Hover's spoke-and-hub traffic patterns enabled the company to use its trucks more efficiently, and as the ICC noted, they allowed Hover to provide overnight service between points in Michigan that would not otherwise receive it. See Service Storage, 359 U.S. at 176 ("the creation of this flow of traffic [less-than-truckload-lot shipments to and from a hub] is a timesaver to the shipper since there is less time lost waiting for the making up of a full truck load"). Although Hover might have been able to route a few of these Michigan-to-Michigan shipments directly (as it had in 1986 until caught by the PSC), we have no basis for rejecting the Commission's conclusion that the spoke-and-hub system was more efficient overall.
 
 
 26
 The petitioners also argue that, the Arrow test aside, the ICC erred in failing to consider the direct evidence of bad faith. Many of the cases relied on by the ICC did not involve such direct evidence. See Service Storage, 359 U.S. at 175; Rock Island, 99 M.C.C. at 312; Jones Motor Company v. United States, 218 F.Supp. 133, 137 (E.D.Penn.1963), petition for reconsideration denied, 223 F.Supp. 835 (E.D.Penn.1963), aff'd sub nom. Highway Express Lines, Inc. v. Jones Motor Co., Inc., 377 U.S. 217 (1964) (per curiam); Missouri Public Service Commission, 103 M.C.C. at 648.
 
 
 27
 We are given pause by the ICC's assertion in this court that "motivation is not relevant here because the criteria set forth in Arrow, supra, have been met." As the ICC has noted elsewhere, direct evidence of bad faith is certainly relevant. See Rock Island, 99 M.C.C. at 307 (efficiency "is not sole test of good faith" but is an "indicator of the carrier's intent"). And "where the matter of comparative efficiency presents a reasonably close question, the issue of lawfulness should not be determined on that basis alone." Rock Island, 99 M.C.C. at 316 (citing Service Storage, 359 U.S. at 176); Thurston Motor Lines, Inc., 104 M.C.C. 1, 15 (1967).
 
 
 28
 The ICC's decision makes it clear that the Commission did consider the relevant evidence. Its discussion of the "direct evidence" that was offered to show subterfuge or bad faith probably leaves something to be desired, but it was within the Commission's province to find, as it did, that the fact that Hover had admittedly engaged in illegalities was not dispositive. It was likewise within the Commission's province to find, as it did, that the statement Hover's Mr. Van Bokkem gave a newspaper reporter about the regulatory consequences of Hover's move to South Bend would not support the conclusion that the move was made solely to bring those consequences about. Where the move is adequately justified on economic grounds, we cannot say the ICC was required to find bad faith because Hover recognized the regulatory consequences as well. Nor can we say the Commission was wrong in giving the apparent efficiency of Hover's operations more weight than the direct evidence of bad faith. Substantial evidence supports the Commission's conclusion, regardless of the accuracy of its subsequent dictum on the irrelevance of motivation.
 
 
 29
 The petitions for review are DENIED.
 
 
 30
 WELLFORD, Circuit Judge, concurring in part and dissenting in part.
 
 
 31
 I concur in the majority's conclusion concerning jurisdiction (Part II) but would augment the discussion by adding the following:
 
 
 32
 In Rock Island Motor Transit Co. v. Watson Wilson Transportation, 99 MCC 303, 306 (1965), aff'd, 256 F.Supp. 812 (S.D.Iowa 1966),[1] the Commission stated:
 
 
 33
 Since the Supreme Court's decision in Service Storage and Transfer Co. v. Virginia, 359 U.S. 171 (1959), it has been settled that the Commission's competence to interpret its own certificates extends to matters such as those involved here wherein it is alleged that Watson's interstate rights are being used as a subterfuge to evade lawful state regulation through the device of routing normally intrastate traffic across the Iowa State line and back.
 
 
 34
 The Court in Service Storage quoted from Castle v. Hayes Freight Lines, 348 U.S. 61, 63-64 (1954) as follows:
 
 
 35
 "Congress in the Motor Carrier Act adopted a comprehensive plan for regulating the carriage of goods by motor truck in interstate commerce." We pointed out that 49 U.S.C. Sec. 312 provides "that all certificates, permits or licenses issued by the Commission 'shall remain in effect until suspended or terminated as herein provided'.... Under these circumstances, it would be odd if a state could take action amounting to a suspension or revocation of an interstate carrier's commission-granted right to operate."
 
 
 36
 359 U.S. at 176. The Court continued, concluding that:
 
 
 37
 It appears clear that interpretations of federal certificates of this character should be made in the first instance by the authority issuing the certificate and upon whom the Congress has placed the responsibility of action. The Commission has long taken this position.
 
 
 38
 359 U.S. at 177.
 
 
 39
 The petitioners have the burden of proof in this case, as the Commission held, to show that 'the considered traffic is intrastate in character" rather than interstate commerce. Missouri Public Service Commission v. Missouri Arkansas Transportation Co., 103 MCC 641, 649 (1967). The petitioners failed to carry this burden.
 
 
 40
 On the question of circuity, I agree with the majority that petitioners have failed to carry their burden of proof. The Michigan Public Service Commission asserts that its data indicated a degree of circuity of 92% with respect to Hover's Michigan operations which are at issue. Petitioners claim that the ICC improperly and erroneously relied instead on a 24% circuity factor. The ICC explained its calculation in footnote 3 to its opinion:
 
 
 41
 This figure takes into account all traffic moving to and from defendant's Michigan terminals (including traffic with origins or destinations outside Michigan). The higher circuity factor proposed by complainant only includes Michigan-to-Michigan traffic. Because all traffic moves in the same vehicles to and from South Bend, it is inappropriate to exclude arbitrarily the traffic moving ultimately to or from points outside Michigan. If defendant [Hover] has a trailer moving to or from South Bend containing traffic destined to points beyond Michigan, the degree of circuity involved in that trip cannot be analyzed properly by excluding that traffic.
 
 
 42
 J/A at 12 n. 3.
 
 
 43
 Petitioners complain that this is a "new approach to determining circuity" or a "total departure" and is "wrong." MPSC Brief at 18; Allied Brief at 9. Allied also complains about the ICC's statement that "[c]ircuity ... does not play a major role in evaluating whether a LTL carrier's operation across a State line is reasonable and logical." J/A at 11. Allied argues also that the proof shows that "Michigan to Michigan service conducted by Hover ... comprised 59% of Hover's overall number of shipments" during a study period, and that 75% of Hover's revenues were "derived from shipments with an origin or destination or both within the State of Michigan." Allied Brief at 9-10 (emphasis in original).
 
 
 44
 ICC has the responsibility to make the factual determinations concerning circuity. Eichholz v. Public Service Commission, 306 U.S. 268, 274 (1939). It has the duty then to consider all the evidence submitted on this question, to analyze it, and to make a decision about the degree of circuity involved, and which factors and data bear most heavily upon that determination. I am in agreement that we should not disturb the ICC findings on degree of circuity even if we entertain some doubt about the logic of its approach and even if the method utilized in this case is a new and total departure from its prior approach to calculation the degree of circuity, unless this calculation and approach may be shown to be arbitrary and capricious with respect to review of ICC orders.
 
 
 45
 I have concern, however, with respect to the conclusion reached by the ICC that the circuity factor "does not play a major role" in the evaluation process of whether or not subterfuge is present. The Supreme Court affirmed a three-judge court decision, Jones Motor Co. v. United States, 218 F.Supp. 133 (E.D.Pa.1963), sub nom., in Highway Express Lines, Inc. v. Jones Motor Co., 377 U.S. 217 (1964) (per curiam), setting aside an ICC determination of subterfuge based solely on circuity. Jones, however, does not translate into a conclusion that circuity is not a major or principal factor, though not the sole or predominant one, in deciding whether or not a motor carrier has engaged in subterfuge. It was described as a "significant factor" in Pennsylvania Public Utilities Commission v. Arrow Carrier Corp., 113 MCC 213 (1971), aff'd 1973 Fed.Carr.Cas. 419 (M.D.Pa.1973) (three judge court), aff'd mem., 415 U.S. 902 (1974). I agree with this description and would hold that, in a case of this nature, the factor of circuity is substantial and must be given full consideration, together with the other factors herein discussed, in determining the question of bad faith or subterfuge.
 
 
 46
 I would, then, remand this matter to the ICC for reconsideration of the question of circuity as having a significant role, rather than denigrating it as "not a major" one. I would expect also that upon remand ICC would explain its rationale for its new approach in calculating the degree of circuity in order to demonstrate that its methodology on circuity is not arbitrary and capricious but rather rational.
 
 
 47
 I am in agreement also with the majority's discussion of economic or operational justification for the ICC's decision under review. It is important to remember that Hover is an LTL carrier, one which handles many "less than truckload shipments in Michigan and in other states." It described its method of operation and the Commission essentially found it to be functionally efficient and logical.
 
 
 48
 Hover currently operates a break-bulk operation. Its main hub facility is located in South Bend, Indiana. Hover operates by collecting freight from the originating points by peddle runs. Such freight is first consolidated at Hover's satellite terminals and then line-hauled to the central South Bend terminal. After being sorted, individual packages are line-hauled back out to the satellite terminals closest to their ultimate destinations, where they are then delivered via peddle runs.
 
 
 49
 Thus, the Commission correctly found that Hover's method of operation was justified.
 
 
 50
 My disagreement with the majority relates to the question of bad faith in this case. The latest statement of the tests for bad faith may be seen in Corporation Commission of Oklahoma v. Film Transit, inc., MC-C-10802 (3/10/82):
 
 
 51
 The tests to determine whether transportation between two points in the same State performed through a point in another State is truly interstate in nature or a subterfuge to avoid State regulation are set forth in Pennsylvania P.U.C. v. Arrow Carr. Corp., 113 M.C.C. 213, 219 (1971), affirmed Pennsylvania P.U.C. v. United States, 1973 F.Carr.Cas. 82, 419 (M.D.Pa.1973), (Pennsylvania ). The Commission and the Courts have looked to the "reasonableness" of a carrier's modus operandi, as evidenced by (1) the degree of circuity involved in the interstate route when compared with the local route normally employed by the intrastate carriers, (2) the presence or absence of economic or operational justification for such routing apart from the carrier's lack of intrastate authority and desire to transport otherwise unavailable traffic, and (3) the incidental or dominant character of the intrastate traffic as a portion of the carrier's operation.
 
 
 52
 Slip Op. at 2.
 
 
 53
 Most of the cases cited by the parties do not involve concrete evidence of bad faith actions which indicate directly, rather than through inference, that a carrier has sought to evade a particular state regulatory control. Analysis of the tests, then, is the means used by the Commission and the courts to determine whether there is subterfuge. In this case, ICC took note that "Hover acknowledges the unlawful operations it permitted in 1986...." J/A at 10. In its brief, MPSC argues, moreover, that "Hover continued to provide false documentation and affidavits containing falsified information to make the direct Michigan to Michigan shipments appear as though they had been routed through South Bend, Indiana." MPSC Brief at 26. ICC makes no mention of these charges, simply observing that Hover instituted procedures "to ensure that such movements never occur again." J/A at 10. Mr. Van Bokkem testified also regarding an incident bearing on this position:
 
 
 54
 Q. Mr. Van Bokkem, do you ever recall telling a newspaper reporter that by moving your facilities from Niles to South Bend that you could in fact serve the State of Michigan without holding authority from the Michigan Public Service Commission?
 
 
 55
 A. I said something to that effect, yes.
 
 
 56
 Q. And would you have said that in about 1983?
 
 
 57
 A. That would have been 1983, yes.
 
 
 58
 Q. Who was the reporter that you spoke to at that time?
 
 
 59
 A. I don't know. It was some local paper.
 
 
 60
 J/A at 67-68.
 
 
 61
 This testimony might be taken as some evidence of an intent to subvert or evade regulation by Michigan authorities, which is material to any inquiry about subterfuge. ICC, however, in its opinion, makes this observation concerning this Van Bokkem statement, which petitioners claim is part of the evidence "that Hover's sole purpose in moving ... was to avoid MPSC regulation." J/A at 13.
 
 
 62
 In any event, motivation is not relevant here because the criteria set forth in Arrow, supra, have been met.
 
 
 63
 Id. (emphasis added).
 
 
 64
 I am at a loss to understand this part of the ICC's conclusions in this controversy. Evidence of bad faith is, indeed, highly relevant to any ultimate determination of subterfuge to circumvent legitimate state regulation. I am aware that in another part of the ICC opinion at issue the Commission finds that the Van Bokkem statement "does not form any basis ... to conclude that the operation is not authorized or even that the purpose of the move to South Bend was to avoid MPSC regulation." Id. Absent the conclusion that "motivation is not relevant," perhaps ICC has chosen a rational explanation for Van Bokkem's admission. I am persuaded, however, that there should be a remand to the ICC for a clear explanation of its rationale concerning the alleged "bad faith" actions of Hover which, are the focus of much of petitioners arguments, recognizing that "no single factor" is controlling.
 
 
 65
 I would DISSENT, therefore, to the extent that I believe a REMAND is required for further clarification and explanation by ICC on the circuity and direct evidence of "bad faith" questions in this case.
 
 
 
 [1]
 It is interesting to note that Justice Blackmun, then a Circuit Judge, was one of the three judges on this panel